## ST. CLOUD PUBLIC SERVICE COMPANY *v.* CITY OF ST. CLOUD.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

No. 10.  Argued October 2, 1923.—Decided May 26, 1924.

1. A State may authorize a municipal corporation to establish by contract the rates to be charged by a public service corporation for a definite term, not grossly unreasonable in time; and the effect of such a contract is to suspend, during its life, the governmental power of regulating the rates.  P. 355.

2. Where a public service corporation and a municipality, having power to contract as to rates, exert it by fixing them for a particular time, the rates are enforceable under the obligation of the contract, even though they become " confiscatory."  *Id.*

3. In Minnesota, a city charter, by authorizing the common council to provide for and control the erection and operation of gas works for supplying the city and its inhabitants with heat and light, and to grant the right to erect, maintain and operate such works with all rights incident or pertaining thereto to one or more private corporations, empowered the City to enter by ordinance into a contract, in its proprietary capacity, with a private corporation, providing for the construction and operation of gas works for the period of thirty years, and fixing the rates for gas sold the City and its inhabitants. P. 359.

4. Where a municipality having both the power to contract as to rates and the power to prescribe rates from time to time, exercises the former, the power to regulate is suspended during the contract, and the contract is binding. P. 360.

5. The provisions of the Minnesota Constitution, Art. IV, § 33, prohibiting the legislature from enacting any special or private laws for granting corporate powers or privileges, except to cities, or for granting to any individual, association or corporation, except municipal, any special or .exclusive privilege, immunity or franchise whatever, do not apply to contracts made by municipalities under charter powers granted them by the legislature. *Id.*

6. An ordinance under which a gas company, in consideration of rights and privileges granted, covenanted and agreed to erect and operate a plant and sell gas, etc., and which contained a clause by which the grantee was " authorized " to sell at not to exceed a price fixed—*construed* as a contract fixing that as the maximum rate. P. 361.

7. A law authorizing cities to regulate rates of public service corporations, cannot be invoked by a company to increase the rates fixed by its contract with a city before the law was enacted. P. 364.

Affirmed.

APPEAL from a decree of the District Court dismissing for want of equity a bill brought by a gas company to enjoin interference with a proposed increase in its rates.

*Mr. J. O. P. Wheelwright* for appellant.

*Mr. R. B. Brower* for appellee.

MR. JUSTICE SANFORD delivered the opinion of the Court.

This suit was brought by the Public Service Company to enjoin the City from interfering with a proposed increase in the rates charged for fuel gas.

The allegations of the bill, shortly stated, are: The Company is a public service corporation organized under the laws of Minnesota, and the City, a municipal corporation of that State. In 1905 the City, by ordinance, granted the Company's predecessor, its successors and assigns, the right to construct and maintain for thirty years works for the manufacture, distribution and sale of gas to the City and its inhabitants, and authorized it to sell fuel gas at a rate not exceeding $1.35 per thousand cubic feet. The grantee's rights were assigned to the Company in 1915, and since then it has been engaged in manufacturing and selling fuel gas under the ordinance.[1] Since 1917 the Company has sold fuel gas at the maximum rate of $1.35 prescribed by the ordinance. This rate has not yielded, and cannot yield any return on the value of the property devoted to the gas business, has resulted in a constant loss and steadily increasing operating deficit, is inadequate and confiscatory, and deprives the Company of its property without due process of law in violation of the Fourteenth Amendment to the Constitution. The City Commission has refused to entertain a petition to prescribe a rate yielding a reasonable return on the invested capital. To secure a fair and reasonable return, a rate of $3.39 per thousand cubic feet is necessary. The Company intends

---

[1] The ordinance also granted the right to construct and maintain for the same period works for the manufacture and sale of electricity. The bill alleges that the gas and electric operations are conducted as distinct and separate departments; and that neither the Company nor its predecessor has ever sold gas except for fuel purposes, there being no demand for illuminating gas.

to increase its rate to that price. The City, however, has threatened to interfere with the collection of the proposed increased rate, and, unless restrained, will attempt to force the Company to continue to sell gas at the prescribed maximum rate, resulting in controversies and multiplicity of suits, and inflicting irreparable loss and injury upon the Company.

The bill prays that the court adjudge that the maximum rate prescribed by the ordinance is confiscatory and violates the rights of the Company under the Fourteenth Amendment; and that the City be enjoined from interfering with the Company in raising the rate to $3.39, or attempting in any manner to force it to continue to sell gas at the ordinance rate.

A motion by the Company for a preliminary injunction was denied. Thereafter, on motion of the City, the court dismissed the bill for want of equity, on the ground that there was a "valid and subsisting contract between the City and the plaintiff Company governing the matter of a maximum rate for fuel gas." The Company, by reason of the constitutional question involved, has appealed directly to this Court. Jud. Code, § 238; *Columbus Ry. Co.* v. *Columbus*, 249 U. S. 399.

It has been long settled that a State may authorize a municipal corporation to establish by an inviolable contract the rates to be charged by a public service corporation for a definite term, not grossly unreasonable in time, and that the effect of such a contract is to suspend, during its life, the governmental power of fixing and regulating the rates. *Home Telephone Co.* v. *Los Angeles*, 211 U. S. 265, 273, and cases there cited. And where a public service corporation and the municipality have power to contract as to rates, and exert that power by fixing the rates to govern during a particular time, the enforcement of such rates is controlled by the obligation resulting from the contract, and the question whether they are

confiscatory is immaterial. *Southern Iowa Elec. Co.* v. *Chariton*, 255 U. S. 539, 542, and cases there cited; *Paducah* v. *Paducah Ry. Co.*, 261 U. S. 267, 273; *Georgia Ry. Co.* v. *Decatur*, 262 U. S. 432, 438. The existence of a binding contract as to the maximum rate for fuel gas is therefore the controlling issue upon which this controversy depends. Its solution turns upon the questions whether the City had power to contract on this subject by the ordinance of 1905; and, if so, whether the ordinance constituted such a contract.

1. Was the City authorized to enter into a contract as to the rate to be charged for fuel gas? Such authority must clearly and unmistakably appear. *Home Telephone Co.* v. *Los Angeles, supra*, p. 273; *Paducah* v. *Paducah Ry. Co., supra*, p. 272. Whether it existed depends upon the laws of Minnesota in force at the time. The consolidated charter of the City (Special Laws of 1889, c. 6, p. 131) provided as follows: The City " shall be capable of contracting and being contracted with; and shall have all the powers possessed by municipal corporations at common law." C. 1, § 1. " The common council in addition to all powers herein . . . specifically mentioned, shall have full power and authority to make . . . all such ordinances . . . for the general welfare of the city and the inhabitants thereof, as they shall deem expedient." C. 4, § 4. " The common council shall have full power by ordinance: . . . To provide for and control the erection and operation of gas works, electric lights, or other works or material for lighting the streets and alleys, public grounds, and buildings of said city, and supplying light and power to said city and its inhabitants; and to grant the right to erect, maintain and operate such works, with all rights incident or pertaining thereto, to one or more private companies or corporations . . . ; to provide for and control the erection and operation of works for heating the public buildings of said city by

steam, gas, or other means, and supplying light, heat, and power to the inhabitants of said city; to grant the right to erect such works and all incident rights to one or more private companies or corporations, and to control and regulate the erection and operation of such works . . ; provided, . . . that the common council shall have authority to regulate and prescribe the fees and rates and charges of any and all companies hereinbefore mentioned." C. 4, § 5, cl. 10.

In construing and giving effect to these provisions of the charter we look to the decisions of the Supreme Court of the State. In *Reed* v. *City of Anoka,* 85 Minn. 294, 297, 298 (1902) the city charter—likewise enacted in 1889—conferred upon the municipality the power " to make and establish public pumps, wells, cisterns and hydrants, and to provide for and control the erection of waterworks for the supply of water for the city and its inhabitants." The city, by ordinance, entered into a contract with individuals for the construction and operation of a system of waterworks for such purposes, for a term of thirty-one years: the city agreeing to pay the grantees a specified sum per year for each hydrant, and restrictions and limitations being imposed as to the charges to be made by the grantees for water furnished the inhabitants. In a suit brought by taxpayers to enjoin the performance of this contract the court said, that there could be " no doubt but that these charter provisions confer upon the municipality authority to enter into contracts with individuals for the purpose of providing itself and its inhabitants with a supply of water. . . . The authorities are very uniform that contracts of this nature are not within the legislative or governmental prerogatives of the municipality, but rather within its proprietary or business powers. Their purpose is not to govern the inhabitants, but to secure for them and for itself a private benefit. . . . It was so held in . . .

*Flynn* v. *Little Falls E. & W. Co.*, 74 Minn. 180. . . .
While this precise point of distinction was not made in
that case, it is authority for the proposition that a munici-
pality does not exercise its legislative functions in enter-
ing into contracts of this kind, but only its business or
proprietary powers, to which the rules and principles of
law applicable to contracts and transactions between in-
dividuals apply." In *City of St. Cloud* v. *Water Co.*, 88
Minn. 329, 332 (1903), there was involved an ordinance
passed by the present appellee in 1887, providing for the
sale of the City's waterworks to certain persons and grant-
ing them the right to maintain the system for the period
of thirty years and to furnish water to its inhabitants at
certain specified rates; in consideration of which the
grantees agreed to extend the system, to furnish water
without charge for certain purposes, and to supply a speci-
fied amount of pure water for domestic purposes. The
original charter of the City (Special Laws of 1868, c. 28,
p. 144) made it capable of contracting, vested it with all
the general powers possessed by municipal corporations
at common law, and gave it the power of establishing and
constructing public pumps, wells, cisterns, reservoirs and
hydrants. In a suit by the City to set aside the contract
entered into by the ordinance for failure of the grantees
to furnish pure water in the stipulated quantities, the
court said: " The obligations of the parties, as set out in
the ordinance, constitute a contract. The city was en-
abled to enter into such obligation by virtue of its charter
powers and the general laws of the state, and was endowed
with the right to construct, or cause to be constructed,
a water system for the benefit of its inhabitants, and had
control of its streets, and could contract with reference to
their use for the purpose of extending the system. . . .
The obligations thus entered into were mutual. Upon
the one hand, the grantees, their successors and assigns,
would be protected by the courts in the enjoyment of their

rights,—for instance, in the collection of the hydrant rentals; on the other hand, the courts of the state are open to the city to secure the enforcement of its rights. No serious question can arise as to the nature of the contract obligation. . . ."

In the light of these decisions of the Supreme Court of the State of Minnesota we think it is clear that the City had authority, in 1905, under its charter and the laws of the State, to enter, by ordinance, into a contract, in its proprietary capacity and for the benefit of its inhabitants as well as itself, providing for the construction and operation of gas works for a period of thirty years and fixing the rates to be charged for gas sold to it and its inhabitants. This power existed, under the doctrine of the *Reed Case,* under the provisions of the charter giving the council the power to provide for the control and erection of gas works for the purpose of supplying the City and its inhabitants with heat and light. And we do not think that this contractual power was limited by the proviso that the council should have the right to "regulate and prescribe" the rates and charges of the companies to which it might grant the right of constructing such works. It is true that, standing alone, this proviso, in the absence of any state decision to the contrary, would, under the construction given similar language in *Home Telephone Co.* v. *Los Angeles, supra,* p. 274, be regarded as conferring authority merely to exercise the governmental power of regulating rates, and not authority to enter into a contract. In that case, however, it was pointed out that there was no other provision of the charter authorizing the city to contract as to rates. And in the present case, as the other provisions of the charter gave the City authority so to contract, we must regard the proviso as merely an alternative provision; that is to say, we think that the City might either contract as to the rates, as an incident to its

power of granting the right to construct and operate the public utility, or, if it did not exercise this power to contract, might thereafter " regulate and prescribe " the rates in the exercise of the governmental authority conferred by the proviso. One power, however, is not destructive of the other. And where a municipality has both the power to contract as to rates and also the power to prescribe rates from time to time, if it exercises the power to contract, its power to regulate the rates during the period of the contract is thereby suspended, and the contract is binding. *Paducah* v. *Paducah Ry. Co., supra,* pp. 272, 273.

We find nothing in conflict with our conclusion as to the City's authority to contract in Section 33 of Article IV of the Minnesota Constitution, as amended in 1881, providing that: " The Legislature is prohibited from enacting any special or private laws in the following cases: . . . 7th. For granting corporate powers or privileges, except to cities. . . . 10th. For granting to any individual, association or corporation, except municipal, any special or exclusive privilege, immunity or franchise whatever." General Laws, 1881, p. 22. Clauses 7 and 10 read together plainly show that the prohibition against the granting of special or exclusive privileges by the Legislature does not apply to the granting of corporate powers or privileges to cities. It did not prohibit the Legislature from granting to the City by the consolidated charter of 1889, the power of contracting in its proprietary capacity in reference to the construction and operation of gas works. If it had had such an effect we cannot assume that it would have been overlooked by the Supreme Court of Minnesota in the *Reed Case,* in which no reference was made to this provision. It is unnecessary, therefore, to consider whether the provisions of the consolidated charter were authorized as an amendment to the original charter of

1862.   See *Brady* v. *Moulton*, 61 Minn. 185.   This constitutional provision is obviously entirely different from that involved in *San Antonio* v. *San Antonio Public Service Co.*, 255 U. S. 547, 549, providing " that *no irrevocable or uncontrollable grant* of special privileges or immunities shall be made, but all privileges and franchises granted by the legislature, or *created under its authority*, shall be subject to the control thereof," which was held to prevent a municipality, acting under the authority of the Legislature, from entering into a binding contract as to public service rates.   The provision of the Minnesota Constitution makes no reference either to irrevocable or uncontrollable privileges, or to privileges created by a municipality acting under the authority of the Legislature and is, as we view it, merely a limitation upon the direct authority of the Legislature itself, to the extent that we have indicated.

Nor do we find anything in the Laws of 1893, c. 74, p. 189 (General Statutes of 1913, § 6137) in conflict with the conclusion which we have reached as to the power of the City to contract as to rates.

2. Did the ordinance constitute a contract fixing the maximum rate for gas?   The intention to so contract must clearly and unmistakably appear.   *Paducah* v. *Paducah Ry. Co., supra,* p. 272.   The essential provisions of the ordinance are: The right and privilege is granted to construct and maintain for thirty years works and instrumentalities for the manufacture and distribution of electricity and gas.   § 1.   The grantee is " authorized " to manufacture and sell electricity and gas to the City and its inhabitants during such period.   § 2.   The construction shall be done with the least practicable inconvenience to the public and individuals, and the " grantee shall restore " all places where excavated to their original condition as far as practicable, and repair all damage done by such excavation.   § 3.   In laying down pipes or

erecting wires the grantee " shall conform " to all rea-
sonable regulations prescribed by the City. § 4. " In
consideration of the rights and privileges herein granted,
the grantee hereby *covenants and agrees* that it will . . .
erect . . . an efficient coal gas generating plant or
system of ample capacity, and after the erection thereof
will manufacture and offer for sale to the city and its
inhabitants coal gas of at least fourteen candle power."
§ 5. " The grantee is authorized hereby to sell illumi-
nating gas when the works therefor shall have been com-
pleted . . . at the price of not to exceed " $1.85 per
thousand cubic feet, " and fuel gas at the rate of not to
exceed " $1.35 per thousand cubic feet, and shall be at
liberty to cut off the supply from any person not paying
for a period of thirty days. § 6. " The rights hereby
granted are upon the express condition " that the City
may purchase the electric and gas works of the grantee
at specified intervals at the appraised value thereof, as
determined by arbitrators to be chosen in a prescribed
manner. § 7.

We think that the language of the ordinance, viewed
in its entirety, clearly shows that it was the intention
of the parties to enter into a contract for the construc-
tion of gas works and the manufacture and supply of
gas to the City and its inhabitants during the thirty-
year period, at the maximum rate prescribed. Although
§ 6 " authorizing " the sale of fuel gas at a price not
exceeding $1.35, is not phrased in the language of an
agreement—as the preceding section whereby the grantee
" agreed " to construct the plant and manufacture and
sell gas to the City and its inhabitants—it is an essential
part of the agreement. It is no less contractual than
the provision in § 2 " authorizing " the grantee to manu-
facture and sell electricity and gas to the City and its
inhabitants for thirty years—upon which the Company
necessarily relies as the basis of the rights which it now

claims and is seeking to enforce—or than that in § 7 giving the City the right to purchase the plant at an appraised value.  The provision that the grantee is "authorized" to sell fuel gas at a rate not exceeding $1.35, clearly implies that it shall not sell such gas at a higher rate.  This is recognized by the bill itself.[2]  In this respect the language has the same effect as that involved in *Vicksburg* v. *Waterworks Co.,* 206 U. S. 496, 508, 516.  There the ordinance granted the right to make such charges for the use of water as the grantees might determine, provided that they should not exceed fifty cents for each thousand gallons.  This was held to constitute a binding contract fixing the maximum rates for water supplied to private consumers for the period of thirty years as set forth in the ordinance.  So in *Reed* v. *City of Anoka, supra,* p. 296, the ordinance imposed "restrictions and limitations" upon the charges to be made; and in *City of St. Cloud* v. *Water Co., supra,* p. 332, the ordinance "gave the right" to furnish water at specified rates.  And provisions in ordinances granting franchises to street railway companies that the rate of fare shall not be more than five cents, or that the grantee shall not charge a higher fare, are contractual.  *Detroit* v. *Detroit Citizens' Street Ry. Co.,* 184 U. S. 368, 369; *Cleveland* v. *Cleveland City Ry. Co.,* 194 U. S. 517, 524; *Cleveland* v. *Cleveland Electric Ry. Co.,* 201 U. S. 529, 532; *Georgia Ry. Co.* v. *Decatur, supra,* p. 434.  And the fact that here the parties intended to contract as to the gas rates is emphasized by the contrast between the provisions of the ordinance as to gas and electricity. While the grantee is authorized to maintain both gas and

---

[2] There are repeated references in the bill to this provision as fixing a maximum rate, thus: The "maximum rate fixed for the price of gas in the ordinance," par. 36; and similar references to the "maximum rate" in pars. 39, 41, 42 and 44, cl. 1.

electric works for the period of thirty years, the ordinance specifies the maximum rates for gas but contains no provision as to the rates for electricity; the apparent purpose being to establish definitely by contract the maximum rates for gas but to leave the rates for electricity to be thereafter " regulated and prescribed " by the council from time to time under the power given it by the proviso of the charter.

3. The general provision of the Laws of 1919, c. 469, p. 603, authorizing cities of the class of the appellee " through its city council or like governing body, by ordinance, to prescribe from time to time the rates which any public service corporation supplying gas or electric current for lighting or power purposes within said city may charge for such service ", has no application to the present case. Even if, in any aspect, it could otherwise be applicable, it is excluded from operating here by the specific proviso that it shall not be " construed to impair the obligation of any contract or franchise provision now existing between any such city and any such public service corporation." The City, clearly, could not avail itself of this statute to reduce the gas rates below the maximum prescribed in the contract of 1905; and the Company, conversely, cannot under it obtain higher rates. The contract is binding on both parties alike.

The decree of the District Court is

*Affirmed.*

MR. JUSTICE BUTLER took no part in the hearing or decision of this case.