## FLORIDA POWER & LIGHT CO. v. CITY OF MIAMI et al. *

No. 8549.

Circuit Court of Appeals, Fifth Circuit.

July 15, 1938.

*Writ of certiorari denied 59 S.Ct. 147, 83 L.Ed. —.

John F. MacLane, of New York City, and Jno. P. Stokes and Will M. Preston, both of Miami, Fla., for appellant.

Sidney S. Hoehl and J. W. Watson, Jr., both of Miami, Fla., for appellees.

Wm. H. Malone, of Miami, Fla., amicus curiæ.

Before FOSTER, SIBLEY, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

This litigation began by Florida Power & Light Company filing on March 15, 1933, a bill to enjoin execution of an ordinance of the City of Miami which fixed rates for electrical service within the City to begin March 24 following, whereby net income would be reduced about $700,000 per annum. The bill claimed that the ordinance, contrary to the federal Constitution, U.S.C.A. Const. art. 1, § 10, cl. 1, impaired the obligation of a contract respecting rates found in Section VII of the franchise ordinance which was passed by the City March 3, 1925, and accepted by Miami Electric Light & Power Company, the grantee, on May 12, 1925. This franchise was assigned to Florida Power & Light Company and the transfer approved by the City early in 1926. The bill also claimed that the new rates were confiscatory under the Fourteenth Amendment, U.S.C.A.Const. Amend. 14. Preliminary injunction was granted, with bond to repay any unlawful charges collected, which is still in force. A Special Master made a careful and elaborate report April 4, 1936, recommending the sustaining of the rates and the dismissal of the bill. The District Judge corrected the report in some of its details, but upheld it substantially, and on Feby. 18, 1937, gave final decree dismissing the bill but without prejudice to the maintenance of a similar suit in the future if conditions so change as to make the rates confiscatory. It provided for refunds to the customers of excess collections pending the suit. This appeal followed, presenting the general questions as to the validity and impairment of the franchise contract and of confiscation, with numerous minor questions arising out of the claim of confiscation.

In considering the impairment of a contract obligation by a state law contrary to the federal Constitution, the federal courts judge independently of the existence, meaning and violation of the contract, leaning to an agreement with the decisions, if

any, of the State Supreme Court. But the powers of a municipality under the Constitution and laws of the State remain a local question on which the State decisions will be accepted as controlling. The Constitution of Florida authorizes the legislature to create cities; and a general municipal power to contract, coupled with a power to provide water or lights for the citizens, may be sufficient to authorize a city to contract for water or lights at a stated price for a limited time. City of Tampa v. Tampa Water Works Co., 45 Fla. 600, 34 So. 631, affirmed 199 U.S. 241, 26 S.Ct. 23, 50 L.Ed. 170; Southern Utilities Co. v. City of Palatka, 86 Fla. 583, 99 So. 236, affirmed 268 U.S. 232, 45 S.Ct. 488, 69 L.Ed. 930. We assume without deciding that the Charter of the City of Miami, though it contains no express authority to fix by contract rates or any element of them, empowers the City in granting a franchise (which is expressly authorized), to make stipulations such as are here involved. We pass therefore to a consideration of what was stipulated, and whether the rate regulation of 1933 impairs any contractual obligation.

The Charter, Sect. 3(k), expressly empowers the City "To establish, impose and enforce water rates and charges for gas, electricity and all other public utilities or other service or convenience operated, rendered or furnished by the City, or by any other person, persons, firm or corporation." The Florida Constitution, Art. 16, Sect. 30, provides: "The Legislature is invested with full power to pass laws * * * to prevent unjust discrimination and excessive charges by persons and corporations engaged as common carriers * * * or performing other services of a public nature." The legislature has passed no law establishing a State Commission to fix or regulate water or electric rates, but has committed the power to various cities, including Miami, and their Charter provisions are held to be laws passed under this constitutional provision and therefore an exercise of the State's police power on this subject. See the cases above cited. Against this background of law the franchise here involved was granted by the City. The material provisions of Section VII relied on as a contract are set forth in full in the margin.* They are peculiar. For five years, expiring in 1930, the grantee is "authorized and empowered to maintain the *same rates * * * as* were in effect on Jany. 1, 1925." Afterwards the rates "shall be such as to yield * * * an annual return equal to *at least* 10% on the contemporaneous rate base." That rate base is to be fixed by adding to an agreed value in 1924 of the property *the total cost* of subsequent extensions and improvements, with no provision for depreciation. If the return in any year proves greater than 10%, one-half of the excess is to be due and payable to the City on March 1st following. Thus after 1930 there is no definite rate established, not even a maximum. The grantee may charge what the traffic will bear, but if it earns more than 10% net according to a stipulated basis of

---

* "Subject to reasonable minimum charges and service guarantees the Grantee hereunder is authorized and empowered to establish and maintain the same rates and charges for electric energy furnished during the first five years of the life hereof as were in effect in the City of Miami on January 1st, 1925. After the expiration of said five year period the Grantee's rates and charges for electric service shall be such as to yield and enable the grantee to earn and pay from its electric revenue all the costs of electric service rendered * * * proper reserves * * * replacements and depreciation * * * and an annual return equal to at least 10% on the contemporaneous rate base. * * * Said contemporaneous rate base shall be determined as of any particular time by adding to $4,911,912, being the agreed and approved value of the property used or held for use in rendering electric service on the 31st day of July, 1924, the total cost of all subsequent extensions and improvements thereof and of all property additional thereto constructed or provided from time to time, used or held for use in rendering electric service. * * * Whenever after the expiration of said five year period the return earned by the Grantee for any calendar year shall be in excess of an annual return as hereinabove defined of 10%, one-half of such excess shall become due and payable to the City and shall be so paid on or before March 1 of the following year. * * * It is the purpose and intent of this provision to maintain as nearly as practicable after the first five year period hereof a basis of charge that will yield the cost of service and the 10% return as hereinabove defined and Grantee shall from time to time, *subject to the lawful regulatory authority of the City or State Commission having jurisdiction*, adjust its rates for electric service in such a manner and to such an extent as will conform thereto."

calculation, half of the excess goes to the City, not back to the customers. These may or may not be taxpayers. The City does not in this grant of franchise put itself in the act or atmosphere of fixing rates as an umpire between the Company and the consumers, but rather is a sort of profit-sharer in the enterprise to be conducted under the granted franchise. The apparent disregard of the consumers' interests is fully explained by what we now proceed to show, that the opportunity of considering those interests was reserved by reserving the full exercise of the police power of rate regulation when the circumstances should require it. Such a reservation might have been implied from the very nature of that police power and because of its express mention in the Constitution and in the City's Charter. But here it is made in the franchise itself. Section VII declares a general purpose to maintain after the first five-year period a basis of charges that will yield a return of 10%, but "subject to the lawful regulatory authority of the City or State Commission having jurisdiction." As the law then stood and still stands the regulatory authority is in the City and not in a State Commission. But the matter does not rest there, for Section X provides: "This grant shall at all times be subject to the right of the State of Florida, directly or through a commission or similar body, to regulate rates and service hereunder." The City of Miami is governed by a Commission. Its officers are certainly a body similar to a Commission, and they have been designated by the State as the authority to regulate the rates and service now in question. When they thus act, they perform no proprietary or administrative municipal function, but they exert the State's police power. After a hearing, they make rates which are just according to law both to the public utility company and its patrons, exerting a power fundamentally legislative. Appellant here concedes that had the legislature directly interposed, or had it subsequently to the grant of the franchise (as in the Tampa Case, supra) granted regulatory power to the City, the provisions of the franchise would have fallen; but asserts that when the City, already having the regulatory power, contracted about rates, the regulatory power was suspended for the period of the contract; citing St. Cloud Public Service Co. v. St. Cloud, 265 U.S. 352, 44 S.Ct. 492, 68 L.Ed. 1050. If there be under some circumstances validity in the asserted distinction, there cannot be here, for the power of regulation was not intended to be suspended, but was reserved by express words, whether residing in the legislature, a commission, or other similar body, or in the City itself. When, therefore, after a full hearing the City Commissioners made the rate regulation here attacked, they in no wise impaired the franchise contract, but acted within its terms.

■ The major question on confiscation is what property, if any, outside of the City of Miami is to be valued in fixing the rate base. Since the City Commission in making the attacked ordinance was not representing the City and its corporate interests under the franchise agreement, but was representing the legislature in rate regulation, the rate base and the rate of return mentioned in the franchise are not controlling, though they may be given some weight in considering what is just and reasonable. The rules and methods generally used are rather to be applied. It would be unreasonable to take as the sole standard of present value cost without depreciation, as the franchise provides, now that the life of some of the equipment must be half exhausted. The Master and Judge did not err in giving controlling weight to reproduction cost, less depreciation, of what is used and useful in supplying Miami with electricity, using historical cost, so far as it appears, for purposes of corroboration or correction. And a return of seven percent may be considered reasonable for an established business in a large City, though ten percent was considered reasonable in the earlier stages and in the midst of the Florida boom when locally profits were exceedingly high. As respects the property to be valued, the City contends that the franchise expressly provided for a generating plant in Miami, as well as a distribution system, and that both were built and still exist sufficient to serve the City, and that nothing besides ought to be valued as used and useful in supplying electricity to the City. The Company shows that at the time it acquired the franchise and the property at Miami it was engaged in building a statewide system of transmission lines extending down the east coast from St. Augustine to south of Miami, and from Fort Pierce west to Fort Myers and Bradenton, served by a large generating plant at Fort Lauderdale twenty-five miles north of Miami, and smaller ones at the north and at the west ends. Since 1927 Miami has been furnished with current from this inter-connected system, along with about one hundred and fifty other towns and communities.

The current is generated at the three plants last mentioned, that at Fort Lauderdale being the largest, and the generating plants which existed at Miami and other towns are used only for "standby" purposes, that is, to be operated in case of emergency. The appellant contends that since all this property is actually used together, it must all be valued, and an allocation made of a fair part of the value according to the current used at Miami, to be added to the value of the local distribution system, in fixing a base for rates at Miami. The City replies that the general system is not necessary or useful to Miami, but an uneconomical arrangement by the use of which it is sought to put upon users at Miami the support of the service to other communities. The Master and Judge held that the generating plant at Miami, consisting of three units, was sufficient to supply the needs of Miami under normal conditions, but insufficient if the largest unit should be disabled, and that to render the service safe and "firm" an additional unit could and ought to be added at a cost of $750,000, which would be a sufficient "stand-by" provision. Since the proportion of the system value sought to be charged in the Miami base was vastly more, it was held just and reasonable to restrict this added value to $750,000. They held that the transmission system was optimistically overbuilt, and that the unit cost of electricity delivered from it is much greater than if generated at Miami, and that the Company could not unnecessarily substitute this system for the local generating plant and expect to charge more because of the change. We uphold that view. From a State standpoint, the development undertaken by the transmission system is no doubt desirable, and may deserve some plan of statewide regulation that will support it justly and wisely. But City regulation at Miami cannot effect that. This is not a case where the current at Miami was originally furnished from the transmission system, and a proposal is made by the City to change over to a City generating plant which would operate more cheaply. The case is that the City plant was the original one, and is still maintained in efficiency and daily under steam as a "hot standby", and the Company is substituting another and more costly source of electricity. The City users are not bound to suffer by the change under the circumstances thus far appearing. Compare San Diego Land & Town Co. v. National City, 174 U.S. 739, 758, 19 S.Ct. 804, 43 L.Ed. 1154; San Diego Land & Town Co. v. Jasper, 189 U.S. 439, 447, 23 S.Ct. 571, 47 L.Ed. 892; Brunswick & T. Water Dist. v. Maine Water Co., 99 Me. 371, 387, 59 A. 537, 543.

The court after correcting some of the Master's findings, found a rate base of $9,322,171, and a net income of $831,784 yielding 8.923%. We think the legislative finding made by the City Commissioners that 7% is reasonable is not overborne by the opinions of witnesses that 8% is reasonable. Certainly confiscation is not shown if the return is as much as 7%. We have considered all the criticisms of these figures, depending for the most part on a weighing of the evidence and the exercise of judgment, and we see no clear error in any of them. Upon one or more there may be doubt, but to change these would not reduce the return below 7%. Confiscation is not established.

▮▮▮▮ The evidence submitted covered the period prior to June, 1934. The case was argued before and decided by the Master and the Judge on that evidence as sufficient. The Judge announced his decision by a written opinion on Oct. 26, 1936. Pending the preparation of findings of fact and conclusions of law and a formal decree (signed Feby. 17) on Feby. 12, 1937, the Company moved to reopen the case to prove that in 1935 and 1936 there had been a great increase in the peak requirements for electricity in Miami and that it would be still greater in 1937. This evidence would have been material to illustrate the generating plant needs at Miami, and might show that the arrangement to take current from the transmission system is proving wise and necessary. It might for the years named tend to show that a larger proportion of the system value ought to have been allowed. But the failure in diligence in presenting the evidence only after the decision had been announced is so gross that the court was well warranted in refusing to reopen this case. We think, however, that should another bill be filed under the terms of the decree to test the rates for the period since the decree, the enquiry ought to begin from Feby. 17, 1937, and that if begun within sixty days from the filing of our remitter, refunds claimed under the bond given on this appeal should stand in abeyance pending its determination; and it is so ordered. With this direction the decree appealed from is

Affirmed.