MINNESOTA GAS COMPANY, a Delaware Corporation, Plaintiff-Appellant,

v.

PUBLIC SERVICE COMMISSION, DEPARTMENT OF PUBLIC SERVICE, STATE OF MINNESOTA, Defendant-Appellee,

and

City of Minneapolis, State of Minnesota, Defendant.

No. 75–1061.

United States Court of Appeals, Eighth Circuit.

Submitted June 10, 1975.

Decided Sept. 26, 1975.

Rehearing and Rehearing En Banc Denied Oct. 21, 1975.
Certiorari Denied Feb. 23, 1976.
See 96 S.Ct. 1114.

582

George C. Mastor, Minneapolis, Minn., for plaintiff-appellant.

Peter W. Sipkins, Sol. Gen., St. Paul, Minn., for defendant-appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, and LAY and HEANEY, Circuit Judges.

LAY, Circuit Judge.

The Minnesota Gas Company (Minnegasco) filed this action seeking a declaratory judgment that a recently enacted Minnesota statute is unconstitutional insofar as it purports to permit a state agency to prescribe utility rates different from those set out in a preexisting utility franchise contract between Minnegasco and the City of Minneapolis. The district court, the Hon. Earl Larson presiding, dismissed the claim on the ground that the State had reserved power to regulate utility rates and that the interference with Minnegasco's contract did not violate the Constitution. We agree and affirm essentially for the reasons set forth in the district court's memorandum opinion, 394 F.Supp. 327.[1]

1. Although the Commission has not yet attempted to change the rates charged by Minnegasco under its contract, the district court found the controversy "ripe" for adjudication because the presence of presumptive authority to alter the rates interferes with Minnegasco's longterm financial planning and performance under the contract. *See Public Util. Comm'n. v. United States,* 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958).

At oral argument this court on its own motion questioned whether the Johnson Act of 1934, 28 U.S.C.A. § 1342, deprived the federal courts of jurisdiction in this matter. The Act provides:

The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and,

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

The Johnson Act was recently held by the Tenth Circuit to prohibit federal courts from entertaining suits for declaratory relief as well as injunctions against state rate orders. *Tennyson v. Gas Serv. Co.,* 506 F.2d 1135, 1139 (10th Cir. 1974). However, in the present case Minnegasco is not challenging a particular administrative *order affecting rates* but rather a

In 1969 Minnegasco entered into a franchise contract with the City of Minneapolis under which the utility was given the exclusive right to provide natural gas service to the City and its inhabitants for 25 years. The contract allowed Minnegasco to set rates annually to insure a 6½% return on investment. In 1974 the Minnesota legislature enacted Minn.Stat. § 216B, the Minnesota Public Utilities Act, which created a Public Service Commission to set rates for and otherwise regulate privately owned utility companies. Section 36 of the Act expressly provides that rates set by the Commission will supercede those provided in existing utility franchise contracts.

 The fundamental question is whether either the Contracts Clause or the Fourteenth Amendment Due Process Clause prohibits a State from setting reasonable utility rates which will supersede those specified in a preexisting contract between a municipality and a privately owned utility company. Clearly, if neither party were a governmental subdivision, no serious federal question would be presented. Regulation of public utility rates has long been held an area of public interest subject to State police power legislation, *Block v. Hirsh,* 256 U.S. 135, 157, 41 S.Ct. 458, 65 L.Ed. 865 (1921); *Munn v. Illinois,* 94 U.S. 113, 24 L.Ed. 77 (1876). It is an implied condition of all private contracts in such areas of public interest that the agreement is subject to frustration by subsequent legitimate exercises of the State's police power. Thus, private parties cannot by contract insulate themselves from State rate regulations adopted thereafter. As the Supreme Court stated in *Union Dry Goods Co. v. Georgia Public Service Corp.,* 248 U.S. 372, 39 S.Ct. 117, 63 L.Ed. 309 (1919):

That private contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict, has been often decided by this court. Thus in *Manigault v. Springs,* 199 U.S. 473, 480 [26 S.Ct. 127, 130, 50 L.Ed. 274], it was declared that:

"It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from properly exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected."

. . .

248 U.S. at 375, 39 S.Ct. at 118.

 Minnegasco urges, however, that a different result is mandated here since one of the parties to the contract was a municipality, a political subdivision of the State. The utility argues that the State empowered the City to enter into *inviolable* contracts for utility rates, and that the effect of such a contract is to suspend the State's regulatory power within the City during the life of the contract. In effect, Minnegasco's view is that the City signed the contract as an agent of the State, that the State must be viewed as a party to the agreement and hence is bound by its terms. We cannot agree.

Minnegasco relies on the Supreme Court's decision in *St. Cloud Public Service Co. v. City of St. Cloud,* 265 U.S. 352, 44 S.Ct. 492, 68 L.Ed. 1050 (1924). In that case, the State had granted the City of St. Cloud both the power to contract for rates and the power to regulate them by ordinance. The City chose to contract for rates. When rising costs made the contract unprofitable for the utility, it sought to avoid the contract as unreasonable and confiscatory under the Fourteenth Amendment. The Supreme Court held that since the City had proceeded by contract rather than by legislation, no Fourteenth Amendment problem was presented, and it upheld the contract

*Minnesota statute* asserting the power to regulate in general. Where the constitutional challenge is to the State's power to regulate *per se* rather than to the procedural and substantive

fairness of an administrative order, the Johnson Act has been held inapplicable. *Public Util. Comm'n. v. United States,* 355 U.S. 534, 540, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958).

against the utility's efforts to secure a rate increase. The Supreme Court did say in *St. Cloud* that:

> [W]here a municipality has both the power to contract as to rates and also the power to prescribe rates from time to time, if it exercises the power to contract, *its* power to regulate the rates during the period of the contract is thereby suspended, and the contract is binding.

265 U.S. at 360, 44 S.Ct. at 495 (our emphasis).

We do not think *St. Cloud* is helpful here, however, for Minnegasco concedes that the State did not delegate to Minneapolis its police power to *regulate* rates; the City had only the power to contract for rates. A Minnesota statute in effect both when the City's home rule charter was granted in 1920 and when the franchise contract was negotiated in 1969 reserved the power to regulate utility rates to the State. The statute provides:

> The state shall at all times have the right to supervise and regulate the business methods and management of any [public utility] corporation and *from time to time to fix the compensation which it may charge or receive for its services.*

> . . . . .

Minn.Stat.Ann. § 300.04 (emphasis added).

Whether the power to contract given the City in its charter includes the right to make inviolable rate contracts suspending the State's regulatory power is a matter controlled by Minnesota law. The Minnesota Supreme Court has stated that a purported grant of such a power must be clearly expressed and that so great a restriction on State police powers will not be implied.

> The power to fix rates charged by public utilities rests primarily with the state rather than the municipality, and in the absence of a constitutional provision, the power to fix or regulate such rates may be delegated by the state to municipal corporations. But the grant to a municipality of the power to make an *inviolable contract* for rates must be in clear and unequivocal terms and the intent to make such grant of power will not be implied.

*Western States Utilities Co. v. City of Waseca,* 242 Minn. 302, 65 N.W.2d 255, 263 (1954) (emphasis in original).[2]

Under the circumstances, the City's exercise of its right to contract had no different effect than the entry of a private citizen into such a contract; it did not suspend the State's police power to set reasonable utility rates. The City acted in its proprietary, rather than its governmental capacity. *Reed v. City of Anoka,* 85 Minn. 294, 88 N.W. 981 (1902). Under Minnesota law, its contract was subject to subsequent police power legislation.

It is well settled that every contract is subject to the implied condition that its fulfillment may be frustrated by a proper exercise of the police power. Of course, such exercise of that power must be for an end which is in fact public and the means adopted must be reasonably adapted to that end. *The same is true of legislation impairing the obligations of a contract of state instrumentality.*

---

**2.** As the district court noted, the Supreme Court in *Home Tel. & Tel. Co. v. City of Los Angeles,* 211 U.S. 265, 29 S.Ct. 50, 53 L.Ed. 176 (1908) observed:

> It has been settled by this court that the state may authorize one of its municipal corporations to establish, by an inviolable contract, the rates to be charged by a public service corporation (or natural person) for a definite term, not grossly unreasonable in point of time, and that the effect of such a contract is to suspend, during the life of the contract, the governmental power of fixing and regulating the rates. . . . But for the very reason that such a contract has the effect of extinguishing *pro tanto* an undoubted power of government, both its existence and the authority to make it must clearly and unmistakably appear, and all doubts must be resolved in favor of the continuance of the power.

211 U.S. at 273, 29 S.Ct. at 52.

*Western States Util. Co. v. City of Waseca, supra,* at 261 (emphasis added).

The same result obtains under the Federal Constitution. In *City of El Paso v. Simmons,* 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965), the Supreme Court considered a Texas statute reducing to five years the previously unlimited right of reinstatement after forfeiture on contracts for land sold by the State. The plaintiff, who sought to redeem land purchased before enactment of the statute, claimed an unconstitutional impairment of his contract. The Supreme Court upheld the statute. Although the State was clearly a party to the land contract, the Court evaluated the legislation under the Contracts and Due Process Clauses using the same test as if the contract had been between private parties. 379 U.S. at 506–09, 85 S.Ct. 577. That test was set out by Chief Justice Hughes in *Home Building & Loan Ass'n. v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934), and requires that the legislation be for a legitimate public purpose under the police powers, and that the means adopted be reasonable and appropriate to the end in view. 290 U.S. at 438. There too, the Chief Justice noted that all contracts, private and public, are subject to the reserved powers of the State. *Id.* at 435–36. In *City of El Paso v. Simmons,* the Court observed:

> The decisions "put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula," as Chief Justice Hughes said in *Home Building & Loan Assn. v. Blaisdell,* 290 U.S. 398, 428 [54 S.Ct. 231, 236, 78 L.Ed. 413]. The *Blaisdell* opinion, which amounted to a comprehensive restatement of the principles underlying the application of the Contract Clause, makes it quite clear that "[n]ot only is the constitutional provision qualified by the measure of control which the state retains over remedial processes, but the state also continues to possess authority to safeguard the vital interests of its people.

> It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect.' *Stephenson v. Binford,* 287 U.S. 251, 276 [53 S.Ct. 181, 189, 77 L.Ed. 288]. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. . . .

379 U.S. at 508, 85 S.Ct. at 583.

In this case the State was not a party to the contract. The State at all relevant times reserved the right to regulate rates by statute, and it never ceded that right to the City. Permitting the Public Service Commission to set reasonable rates after notice and an opportunity for the utility to be heard does not contravene the Federal Constitution.

The decision of the district court is affirmed.