STATE, EX REL. CONSUMERS PUBLIC POWER DISTRICT, RELATOR, v. WALTER A. BOETTCHER, RESPONDENT.

291 N. W. 709

FILED APRIL 26, 1940. No. 30886.

*C. N. McElfresh,* for relator.

*Munger & Rhodes,* for respondent.

*Clarence T. Spier, W. D. Deakins, Jr., Zelma D. Derry, George A. Munro, Paul C. Holmberg, Harold M. Shultz, Philip H. Robinson* and *H. D. Hunter, amici curiæ.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

PAINE, J.

This is an original action in mandamus. The relator is the Consumers Public Power District, of Columbus, Nebraska, and such relator prays that an alternative writ of mandamus should issue, requiring its own secretary, in accordance with a resolution duly passed, to sign, execute and deliver a memorandum of agreement, exhibit C, dated November 20, 1939, which is supplementary to a memorandum of agreement, dated September 6, 1939, marked exhibit B, also attached to the petition, which the secretary has duly signed. The sole question at issue is whether this supplementary agreement, which the secretary refuses to sign, is valid.

The relator is organized under Senate File 310, ch. 86, Laws 1933, as amended, and found in sections 70-701 to 70-719, Comp. St. Supp. 1939, being an act relating to irrigation, and also to the generation, distribution, transmission, sale, and purchase of electric energy for lighting, heating, power, and other purposes, and to provide for the creation and incorporation of public power districts.

The relator, Consumers Public Power District, was organized August 5, 1939, the electors of said relator district being exactly the same as electors of the city of Columbus.

The application for mandamus was filed January 2, 1940, by the Consumers Public Power District against Walter A. Boettcher, its secretary, and sets out, in brief, the following facts: That the Consumers Public Power Dis-

trict was organized August 5, 1939, and the nature and purpose of its business includes the leasing, purchasing, or otherwise acquiring of the Northwestern Public Service Company, a Delaware corporation, including generating plant and distribution systems in the counties of Platte, Butler, Colfax and Merrick, and the Columbus division of the company, with all of its real and personal property; that the boundaries of the Consumers Public Power District are the same as the boundaries of the city of Columbus; on August 12, 1939, the relator entered into a lease agreement with the Northwestern Public Service Company for the lease and purchase of its Columbus division, said lease being contained in a printed book of some 41 pages, attached to the petition as exhibit A; on August 21, 1939, the mayor and council of the city of Columbus passed an ordinance granting a franchise, in the form proposed in said agreement, exhibit A, to the Northwestern Public Service Company, and on September 25, 1939, said ordinance, to run for 25 years, was duly and regularly approved by the electors of the city at a special election; on October 15, 1939, the relator district entered into possession and took over the operation of all the properties of the Columbus division of the Northwestern Public Service Company, in accordance with the terms and provisions of the lease agreement, and is now in possession and operation thereof; on September 6, 1939, an agreement was entered into by the relator district and the city of Columbus with respect to the sale of the distribution system of the Columbus division to the city, said agreement consisting of two typewritten pages, marked exhibit B, and attached to the application filed herein; that on November 20, 1939, a memorandum of agreement, exhibit C, between the relator district and the city of Columbus was agreed upon for the purpose of clarification of paragraph No. 2 of the agreement, exhibit B, and copies of said clarification agreement and the resolutions with reference thereto are attached to said petition as exhibits C, D and E; that the resolution adopted by the city of Columbus, being exhibit D, provided that the

mayor and city clerk be authorized to execute, attest and deliver said memorandum of agreement on behalf of the city of Columbus, but that, as it was desirable to clarify the contract so as to show that it was the intention of the parties that the price paid should in no wise exceed the amount specified, a new paragraph No. 2 was substituted for the original paragraph No. 2, which substituted paragraph provided that, in the event the relator district should exercise the right retained in the aforesaid lease to pay the full purchase price for the property leased from the Northwestern Public Service Company under said lease, and thereby acquire full title to said property, then the city agrees to buy from the district, and the district agrees to sell to the city, all of said properties located within the corporate limits of the city of Columbus, upon the following terms and conditions: (a) Notice by city to district, in writing, 90 days prior to date fixed in said notice for taking title, of the city's intention to acquire the facilities; (b) payment by the city to the district, in cash, of an amount which, when applied by the district to the payment of indebtedness incurred by the district in the purchase of said properties, or to the redemption of the bonds of the district issued for the purpose of paying for said purchase price, will reduce the unpaid portion of such indebtedness, or the amount of such bonds then outstanding, to an amount such that the revenues of that portion of the properties remaining in possession of the district will be sufficient to pay the balance due on the principal and interest on such indebtedness or all debt service charges on such bonds outstanding subsequent to such redemption according to the terms of the bonds as the same shall fall due, and all other pledges, liens, charges, and expenses whatsoever incurred, payable from said revenues prior to the payment of said amount. That exhibit E, attached to the petition, is the resolution adopted by the board of directors of the relator district, providing that the president and secretary of said district be authorized and directed to execute and deliver said memorandum of agreement for and on behalf of said dis-

trict. That immediately following the execution, attestation, and delivery of said agreement by the mayor and city clerk on behalf of said city to the relator district, the same was presented by the relator to the president, Charles B. Fricke, of said district for execution and delivery on behalf of the district in accordance with the resolution, exhibit E, whereupon the said Charles B. Fricke, president, signed the same, and the respondent, Walter A. Boettcher, secretary of said district, refused to sign the same, by reason whereof the memorandum of agreement remains unexecuted and undelivered by the relator district. That demand has been made upon the respondent Boettcher to execute and deliver the same in accordance with the resolution adopted by the board of directors of the relator district of which he is secretary, and that Secretary Boettcher has refused, and continues to refuse, to execute and deliver the agreement, which refusal results in prejudice to the district, and in order to facilitate and expedite and make possible the issuance and sale of the bonds of the relator district, and thus accomplish a saving to the district of approximately $9,000 a year in interest over a long period of years, the relator district prays for an alternative writ of mandamus, requiring that the respondent-secretary should sign, execute and deliver said memorandum of agreement in accordance with the resolution of November 20, 1939, adopted by the relator district.

On December 28, 1939, Walter A. Boettcher, respondent, filed a showing in this court in opposition to the proposed mandamus writ, which sets out: (1) That the questions involved are of great public interest, and important, and should be speedily decided; (2) that in order to inform the court upon the proposed issues the respondent attaches a copy of the answer which the respondent will file if the court takes jurisdiction of the case, wherefore the respondent prays that, if this court takes jurisdiction, he may be permitted to file his answer and be given opportunity to be heard by written briefs and oral argument.

The answer attached to the showing by the respondent

admits each and all of the allegations of fact as set out in the alternative writ and application, and for his defense alleges that the proposed contract is *ultra vires,* illegal and void as against public policy for the following reasons: (1) That the city council and district board have attempted to bind future councils and boards of the Consumers Public Power District as to the price to be paid for the distribution system, whereas the statute of Nebraska leaves the determination of the reasonableness of the price to the board of the power district and the city council at the time of the determination of the city to acquire the distribution system; (2) that the price for the property to be determined under the contract does not conform to the requirements of the statutes that it be fair and reasonable, for no fixed price is set; (3) that the formula agreed upon for arriving at the price is arbitrary and capricious, and not proper in that it is not based upon the fair value of the physical assets, but is to be determined solely upon the amount of debt of the relator district incurred for the purchase of the system, and the amount of revenues available to the district for the retirement of the debt; (4) that the provisions of the contract as to the purchase price of power by the city of Columbus from the relator power district after the acquisition of the system is in restraint of trade and against public policy; (5) that the formula contained in the contract for arriving at the purchase price of electric energy to be purchased by the city from the district is arbitrary, and not fair and equitable, in that it is not to be determined according to the value or cost of the production of the energy, but solely upon the amount of the debt of the district outstanding and the revenues available from other sources for the retirement of the debt.

The respondent in his answer further alleges that he would be subject to personal liability in a large and unknown amount if he executed and delivered the proposed contract, which is *ultra vires,* illegal and void as against public policy for the reasons hereinabove set out. Wherefore, respondent prays that the court may deny the issuance

of any writ of mandamus against him, and for judgment in favor of the respondent.

It is necessary to call attention to a few points in exhibit A, the printed lease of 41 pages, which lease recites the property owned by the Northwestern Public Service Company in the counties of Butler, Colfax, Merrick and Platte, which properties are said to have an agreed value of $1,259,000; that all of said properties are specifically described as to real estate and personal property in exhibit A, attached to said lease. It was provided in paragraph 4 that the lease and none of its provisions should become effective until a new valid 25-year franchise was granted to the Northwestern Public Service Company by the city of Columbus in substantially the form set out; that the Central National Bank of Columbus is appointed trustee, and may appoint such bonded employees or agents as are satisfactory to both parties; that the monthly income shall be disbursed by the trustee on the 15th of each month by paying, first, to Guy C. Myers, $524.58 each month for 60 months, and to the company $7,327.47 each month for 60 months and $7,852.05 each month thereafter for the use of the properties.

In this printed lease, exhibit A, paragraph 8 provides that the title to everything, including additions, replacements, and improvements, shall at all times remain in the Northwestern Public Service Company unless and until the district shall have paid in full and in cash the sum of $1,259,000, with 5 per cent. interest, at which time the title shall be conveyed to the district.

Paragraph 14 provides that, on the other hand, the Consumers Public Power District holds the company harmless of all liability after date possession is given.

The ones who drafted this lease did not overlook the fact that the cities have had in Nebraska the right to acquire such electric light properties by eminent domain, and therefore provided in paragraph 16: "It is agreed that this lease agreement shall not and cannot prevent condemnation proceedings of part or all of the leased properties by any of the

villages or cities served by such properties, and that if part or all of such properties are acquired by any of such cities or villages by statutory condemnation proceedings, the proceeds thereof shall be paid to the company immediately, and applied upon the payments last due under the lease. The interest payments under the lease to be reduced in proportion to the amount so paid."

Paragraph 21 gives the district the right at any time during the term of the lease to purchase the leased properties at a price of $1,259,000, with interest at 5 per cent. from the date possession of the leased premises was delivered to the district.

Paragraph 22 states that, when the full purchase price, with interest at 5 per cent., is paid in cash, the company agrees to sell and convey to the district, its successors or assigns, for the sum of $10, all of the leased properties, with improvements and additions thereto, together with a release of the trust indenture, dated January 1, 1927, and given to the Equitable Trust Company of New York and another as trustees, to secure first mortgage gold bonds in the amount of $7,758,500, which bonds are due January 1, 1957.

Paragraph 39 provides that the district shall comply with the provisions of Legislative Bill No. 168, 1939 session, and shall annually pay out of its revenues to the state, counties, cities, villages and school districts in which the leased properties are located, in lieu of taxes, a sum equal to the amount that was received during the year immediately preceding the purchase of said property by said district.

Exhibit B, attached to said petition, is the agreement of September 6, 1939, between the Consumers Public Power District and the city of Columbus, and provides as follows: That at a meeting of the mayor and council on August 21, 1939, with the officers of the district, it was agreed that, in the event the Consumers Public Power District acquired said properties, it would, upon the payment of the indebtedness of the district incurred in such purchase, transfer and convey to the city that portion of said properties of the

Columbus division consisting of the distribution system within the corporate limits of the city for a consideration of $1, and it was agreed:

"1. In the event District makes default in any of its obligations under said lease, which is not cured within the period specified in said lease, City, as assignee of District, shall have the concurrent right to purchase the properties referred to in said lease in accordance with the provisions thereof.

"2. City shall also have the right to acquire the distribution system within the corporate limits of the City of Columbus, at any time upon payment by it of the proportionate unpaid balance of the purchase price of said distribution system under said lease, in which event District shall convey to City all of its right, title and interest in and to said properties.

"3. Upon payment of the indebtedness of District incurred in such purchase, District shall upon affirmative request of the Columbus City Council transfer and convey to City that portion of said Columbus Division, consisting of the distribution system within the corporate limits of City, for a consideration of One Dollar ($1.00)."

Exhibit C, attached to the petition, is the vital memorandum of agreement between the Consumers Public Power District and the city of Columbus to modify and clarify paragraph 2 of the agreement hereinabove set out. It provides that, if the district buys the properties leased from the Northwestern Public Service Company, the city of Columbus agrees to buy from the district, and the district agrees to sell to the city, all of the properties used in the distribution of electric energy to consumers, both wholesale and retail, located within the city of Columbus, upon condition that the city shall pay to the district an amount which would reduce the unpaid portion of the indebtedness incurred in the purchase by the district of said properties, or the amount of bonds then outstanding, to an amount such that the revenues of that portion of the properties remaining in the possession of the district would be sufficient to pay the

balance due on such indebtedness, or all debt service charges on the bonds outstanding as the same shall fall due, together with all other pledges, liens, charges, and expenses whatsoever theretofore incurred and payable from said revenues prior to the payment of said amount.

In *Drummond v. City of Columbus*, 136 Neb. 87, 285 N. W. 109, it was held by this court under section 18-1601, Comp. St. Supp. 1939, that a city election, held in Columbus to purchase a portion of this same public utility, was void. The ballot failed to state clearly the substance of the proposition submitted to the voters, who were thereby misled as to the material questions of fact upon which they were voting. It now appears that there were continued negotiations respecting the purchase of the Northwestern Public Service Company's plant in the city of Columbus, and finally a price of $1,259,000 was agreed upon, and all of the details relating to the purchase of this private power company's property had been worked out prior to the organization of the Consumers Public Power District in the case at bar.

Many questions are raised by the record set out in this case. It may be questioned whether the present city council has the right to bind future city councils by the agreement, which can run as long as 25 years.

Could the city contract to buy this electric system when the formula in reality fixes no definite price to be paid and the statute requires that the price shall be fair and reasonable? The price to be paid under the formula depending upon the amount of bonds outstanding and the allocation of earnings.

Can the present city council of Columbus surrender its clear statutory power to purchase this electric system by the exercise of its power of eminent domain and fixing its value by a court of condemnation?

As to the first question above, the general rule seems to be that, as to the binding effect of legal contracts extending beyond the terms of officers acting for the municipality, there exists a clear distinction between governmental and

business or proprietary powers. With respect to the former, their exercise is so limited that no action taken by the governmental body is binding upon its successors, whereas the latter is not subject to such limitation, and may be exercised in a way that will be binding upon the municipality after the board exercising the power shall have ceased to exist. 3 McQuillin, Municipal Corporations (2d ed.) 952, sec. 1356.

"If the contract in question is valid, it constitutes a bargaining away of a right given to the city, to be constantly exercised for the welfare of the city. It is difficult to see what changes the future may demand and require." *Connersville Hydraulic Co. v. City of Connersville*, 95 Ind. App. 234, 173 N. E. 641.

It has been very evident that cities have been greatly handicapped by limitations upon the power to borrow, imposed by constitutional and statutory provisions, which have proved to be serious obstacles in securing the share of millions of dollars being expended by the federal government. An effective method of avoiding constitutional limitations has been the revenue bond, which is a negotiable obligation, payable entirely from revenues of a public utility constructed with the proceeds. Courts have held that a revenue bond does not come within constitutional provisions limiting the amount of indebtedness. 10 So. Cal. Law Review, 333 (March, 1937) ; 22 Cornell Law Quarterly, 64 (Dec. 1936).

The most comprehensive discussion of revenue bond financing which has come to our attention is that written by E. H. Foley, Jr., general counsel of the Federal Emergency Administration, and found in 35 Mich. Law Review, 1-43.

England and Scotland used revenue bonds for public financing much earlier than did the United States. The Leith Dock Commission, Clyde Navigation Trust, Dundee Harbor Commission, and Glasgow Harbor Commission all issued revenue bonds as early as 1817. 12 Ind. Law Journal, 266 (April, 1937).

Perhaps the first decision upon the validity of revenue obligations in the United States was by the supreme court of Washington in 1895, in the case of *Winston v. City of Spokane,* 12 Wash. 524, 41 Pac. 888. The bonds were to be paid out of 60 per cent. of the receipts of the waterworks system, and the court held the obligations were not debts of the municipality.

When municipal revenue bonds are issued, provisions of the Constitution and statutory law in force when they are issued become part of the bondholders' contract in all respects, in the same manner as the statutory law becomes a part of the contract evidenced by a municipal tax obligation. *Brewer v. City of Point Pleasant,* 114 W. Va. 572, 172 S. E. 717.

The law in reference to a city acquiring an electric light and power plant is found in sections 19-701 to 19-707, Comp. St. 1929. It provides briefly that, whenever the electors of a city vote to acquire an electric system located within said city, or partly within and partly without, even though its franchise may not have expired, the city shall have the power and authority, by an exercise of the power of eminent domain, to appropriate and acquire, for public use of such city, such electric system. If 60 per cent. of the votes cast at the special election are in favor of the purchase thereof, the city council shall certify such result immediately to the supreme court, which court shall within 30 days appoint three district judges of the state to constitute a court of condemnation, and such court shall find the value of the system by taking evidence of witnesses, and has the power to require the production of all books and papers and everything deemed necessary for a full investigation and ascertainment of the value of said system. Upon the fixing of the value of such system by said court of condemnation, appeals may be taken, and upon final judgment being pronounced said city shall have the power to issue and sell bonds to pay the amount of the value and judgment without a vote of the people.

There can be no question but that the legislature antici-

pated over 20 years ago that the electors of a city might vote to acquire an electric system, and definitely prescribed in our statute, in the sections just summarized, a method by which it could be accomplished.

This law, which has been in effect since 1919, provides that a city of the first or second class may acquire private property for public utilities by eminent domain and a court of condemnation, as set out in sections 19-701 to 19-707, Comp. St. 1929, and we are now faced with the recent law enacted in 1933, and amended in 1937 and 1939, which provides that a public power district may be organized in a municipality according to the plan followed in the organization of the Consumers Public Power District of the city of Columbus, and that such public power district may purchase private corporations engaged in public utility business, and may finance such purchase by the issuance of revenue bonds, hypothecating its revenue, incomes, receipts or profits to pay either the federal government or others to whom it owes for the purchase of such systems, and in this section 70-712, Comp. St. Supp. 1939, a complete and detailed plan has been set out by our legislature, whereby such public power district may sell to any city any electric systems which it has so purchased when and if the board of directors of such public power district and the city shall agree upon such terms as each may deem fair and reasonable. Such section further provides that, if the public power district and the city fail to agree, the city shall purchase from the public power district through the provision for acquiring the same through eminent domain.

We are, therefore, faced with the fact that the legislature in 1933 provided an alternative method to be used only in case a city desired to purchase a public utility system of a public power district, in which case alone the terms of such purchase could be arrived at by the agreement of the parties. There is no indication that the latter statute repealed the former by implication, but there is clear evidence that the subsequent legislation is not inconsistent with the former, because, in case of a failure to agree upon the

terms of purchase, the law of 1933 directs that the purchase shall then be made through the power of eminent domain possessed by the city in such cases.

We reach the conclusion that there is no conflict between the two statutes, but the last one gives the right to a city, when buying a system from a public power district, to reach the terms of the sale by agreement, and not by condemnation, and if this should be considered as a conflict between the two methods provided by these laws the earlier enactment must give way to that extent to the later, but in this case it is better to take the position that the later act is simply cumulative, and gives a new method for doing the same thing. 1 Lewis' Sutherland, Statutory Construction (2d ed.) 461, sec. 247, and 540, sec. 280.

In the brief of the respondent it is insisted that *Grantham v. City of Chadron,* 20 Fed. (2d) 40, is directly in point, and adds: "A careful search of the authorities has failed to disclose any other case where the facts are close to the case at bar and where the same question of law was directly involved, and relator cites none in its brief. It is therefore contended that the above cited case is entitled to great respect and persuasive force as an authority which might be followed by this court in this case upon the fundamental question of whether the statutory right to condemn at fair and reasonable value can be contracted away for all future time either by providing a fixed price which is mandatory or by making a formula which will do the same thing or at least is not based on the then fair and reasonable value standard."

We will, therefore, examine with care this *Grantham* case. It was decided by the circuit court of appeals of the eighth circuit in 1927. It was appealed from the United States district court of Nebraska, J. W. Woodrough, judge. The city of Chadron, Nebraska, proceeded by regular ordinance to make appropriations for a right of way for a pipe line for a water system under the law now known as sections 16-601 and 16-602, Comp. St. 1929. In the condemnation proceedings the appraisers awarded $600 as the

damages for the right of way. An appeal was taken to the district court of the United States, and appellants filed a petition, setting up a conveyance by them to the city of Chadron of the right of way under a contract between them and the city for the submission to arbitrators, containing an award of $5,000 for the right of way over the premises, and alleged the invalidity of the condemnation proceedings, and asked specific performance of $5,000 under the agreement with the city. The answer of the city alleged that the contracts were executed by the city without due authority, and that the award was void and unenforceable, and that the same was obtained by fraud. The special master entered a finding that the contract upon which the appellants relied was never officially approved by the city of Chadron, and recommended a dismissal of the petition for want of equity. The report of the master was approved by the district court, and upon appeal this judgment was reversed by the circuit court of appeals for this district, with directions to remand the case to the district court for Dawes county. The circuit court of appeals held that the city, in obtaining the right of way for a pipe line by condemnation, was exercising a right conferred upon it by statute as a police power, and that the effect thereof was a repudiation of the alleged contract of arbitration, and that a repudiation of a contract was not an impairment of the contract under the Constitution of the United States.

It is our understanding that all the authorities agree with this *Grantham* decision that municipal and water supply systems, being entirely in the interest of public health and safety, are handled by the city under its police power. 11 Am. Jur. 1020, sec. 271. But, on the contrary, it is held that the purchase of an electric light and power system is not entered into by virtue of the governmental functions of the city, or under its police power, but is entered into as an ordinary business enterprise. This court has recently held in *City of Curtis v. Maywood Light Co.*, 137 Neb. 119, 288 N. W. 503, that the business of operating a municipal light plant is wholly outside the governmental powers and

functions of such city, and is bound by all the rules of law and procedure applicable to any other private corporation engaged in a like enterprise.

The case of *City of Omaha v. Omaha Water Co.*, 218 U. S. 180, 30 S. Ct. 615, is in point in the discussion of the proper elements to consider in arriving at the price to be paid. The ordinance of 1880, giving the privately owned water company a franchise, provided that the city might buy it at any time after the expiration of 20 years at an appraised valuation ascertained by three engineers, the majority of whom fixed the value of the system at $6,263,295.49. Justice Lurton said: "There is not the slightest evidence in the record of partiality, bad motive or misconduct affecting the action of the board. Its members appear to have been gentlemen of high character professionally and otherwise. * * * In the absence of any evidence of actual bad faith we do not hesitate about agreeing with the circuit court of appeals in the conclusion that there was no such misconduct as to vitiate the valuation." It was held that the legislature may authorize a city to purchase a water system to extend beyond the limits of the city, and to supply water to adjacent sections. A transaction of great magnitude will not be defeated because of minor obstacles.

Cities of the first and second class have the power, after an affirmative vote of their electors, to acquire electric light and power plants located in or partly within their corporate limits by eminent domain. Comp. St. 1929, sec. 19-701. Under this act, the municipality was required to pay the amount found due by the condemnation court.

Under section 18-1601, Comp. St. Supp. 1939, a city may purchase electric light systems when authorized by a vote of the electors, and pay for the same only by revenue bonds payable out of the earnings of the plant.

In the case at bar, the Consumers Public Power District was created by virtue of Senate File 310, Laws 1933, as later amended, and found as sections 70-701 to 70-719, Comp. St. Supp. 1939, which law permits a city to buy an electric system from a public power district, at a price to

be fixed by agreement, or, if they fail to agree, the price to be fixed by eminent domain, and to pay for the same by giving revenue debentures, notes, warrants, or other evidences of indebtedness payable solely from the revenues, income, receipts, and profits from the operation of the plant.

The crux of the case at bar is found in the single-page memorandum of agreement, attached to the petition as exhibit C, which memorandum the secretary of the power district refuses to sign, and the purpose of this action being to compel him to sign it, we will examine it with some care. This agreement, exhibit C, instead of giving the city an option to purchase from the power district, provides that, in the event the district buys and pays the full purchase price to the Northwestern Public Service Company, then the city agrees to buy from the district that part of the distribution system located within the corporate limits of Columbus by giving notice 90 days prior to the time of taking over the title, and, further, by the city paying to the district in cash an amount which, if applied by the district in the payment of its indebtedness to the Northwestern Public Service Company, will reduce the unpaid portion of such indebtedness, or the amount of such bonds then outstanding, to an amount such that the revenues of that portion of the properties outside of the city of Columbus will be sufficient to pay the balance due for principal and interest on such indebtedness or all debt service charges on such bonds outstanding according to their terms as the same shall fall due, and all other pledges, liens, charges, and expenses whatsoever theretofore incurred and payable from said revenues prior to the payment of said amount.

It will be seen by a careful examination that this supplemental memorandum of agreement, exhibit C, changes entirely the simple procedure by which the Consumers Public Power District purchases the property in the Columbus division from the Northwestern Public Service Company, and pays for the same by revenue bonds, which are a first lien upon the income of the utility, and when

such utility is paid for to give it to the city of Columbus as a going concern for one dollar, and by this exhibit C it appears that the city of Columbus is bound to take over as assignee the properties lying within the city of Columbus in case the Consumers Public Power District defaults in its payments, and the city in that case agrees to pay all of the items which have hereinbefore been set out.

According to the agreement, the city of Columbus does not agree to buy the property at some time in the future, at a fair and reasonable price to be determined by a court of condemnation at that time, nor does the city agree that, when it does take over the plant now being operated by the power district, it will pay for the same only by revenue bonds issued against the earnings thereof, as provided in section 70-712, Comp. St. Supp. 1939, but, on the other hand, exhibit C obligates the city to pay an amount to be computed at the time the city takes it over, under the terms of a very intricate and complicated formula.

The purpose of this formula appears to the court to bind the city to make full and complete payment according to the terms of the lease-purchase agreement between the Northwestern Public Service Company and the public power district, not out of income of the plant and liquidation of revenue bonds, but to pay everything then due according to the original contract.

By this purchase, under such an involved formula, it appears that the court is called upon to approve and confirm a plan by which the city of Columbus guarantees the purchase price, not out of revenues of the plant, but by an obligation which courts might enforce the city to pay by judgment levies to be paid by the taxpayers. In our opinion, if this is the purpose and effect of the formula, as we believe it is, it is invalid and void.

WRIT DENIED.

SIMMONS, C. J., and CARTER, J., concur in the result.

JOHNSEN, J., dissenting.

Under section 70-712, Comp. St. Supp. 1939, a city has the right to purchase, and a public power district is re-

quired to sell, any "electric distribution system, situated within or partly within such city or village, but not within the corporate limits of any other city or village." If the city and public power district are unable to agree upon a price and terms, the city may resort to condemnation proceedings under the general statute.

So far as the facts in this case are concerned, it is unnecessary to decide whether the purchase must be a present one, or whether an agreement may validly be made to purchase at some future time, definite or indefinite. No such situation is here involved. The city did not enter into a contract to purchase; all that the contract and modification agreement did was to give it an option or right to purchase in a particular manner and on a particular basis. It was not obligated to take over the distribution system on this basis, since it was not required to exercise its option. Its option right could obviously not be a purchase, if it was never exercised. So long as it was not a purchase, the city had the right at any time to enter into further negotiations on any other basis, and, if it failed to agree with the district on price and terms, to resort to condemnation.

The majority opinion is predicated upon the view that the contract and modification agreement did not constitute a mere option. On that point, however, I cannot see how there can be any sound disagreement. The brief of respondent and that filed by various city attorneys as *amici curiæ* recognize it as such. While the modification agreement recites that the city hereby agrees to buy from the district, and the district hereby agrees to sell to the city, it provides further that such agreement is subject to and upon the condition that the city must give 90 days' notice to the district of its intention to acquire the facilities. In addition, the modification agreement leaves in full force the third paragraph of the original agreement, which provides: "Upon payment of the indebtedness of District incurred in such purchase, District shall upon affirmative request of the Columbus City Council transfer and convey to City that portion of Columbus Division,

consisting of the distribution system within the corporate limits of City, for a consideration of One Dollar ($1.00)." Thus, the purpose and legal effect of the entire agreement are that the city agrees that, if it elects to exercise its option, it will do so by giving 90 days' notice and will then take the property over on the basis provided in the contract. If it does not choose to exercise its option, it may simply wait until the district has entirely paid for the property and then demand a conveyance of the facilities within its corporate limits on payment of the sum of one dollar. It is still free to ignore its option and attempt to enter into further negotiations with the district, and, until it has made a definite purchase, it is not precluded from exercising its power of condemnation.

The result of this view is to preserve to the city whatever benefits may exist in its favor under the option agreement and to have future city authorities free to exercise it, if they determine, on the basis of the price formula, before the option is exercised, that it is to the advantage of the city at any time to do so.

This is where the agreement of the parties leaves them, whether it accomplishes what they had in mind or not. The city is entitled to have saved to it whatever advantage there is in the contract, and the objections made by respondent are not valid against such an analysis. In this situation, and without consideration of the propriety of the form of the remedy, as to which no question is raised, a writ of mandamus should be granted.