T. V. TRANSMISSION, INC., APPELLEE, V. CITY OF LINCOLN, DOING
BUSINESS AS LINCOLN ELECTRIC SYSTEM, APPELLANT.

374 N.W.2d 49

Filed September 27, 1985.    No. 84-549.

Douglas L. Curry and Mary C. Wickenkamp of Erickson &
Sederstrom, P.C., for appellant.

John H. Fullenkamp and Betty L. Egan of Walsh,
Walentine, Miles, Fullenkamp & O'Toole, for appellee.

BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

T.V. Transmission, Inc., a corporation succeeding to the rights of CATV Company in a contract with the City of Lincoln, doing business as Lincoln Electric System, brought this action seeking a declaration of rights under the contract and an injunction preventing Electric System from treating T.V. Transmission as if it had breached the contract by refusing to agree to a greater pole attachment rental than that initially specified in the contract document. Electric System counterclaimed, seeking a declaration that T.V. Transmission had defaulted on the contract. The district court entered judgment in favor of T.V. Transmission, enjoined Electric System from treating T.V. Transmission as if it had defaulted, and impliedly dismissed Electric System's counterclaim. For the reasons hereinafter stated we affirm.

On September 21, 1967, Electric System, T.V. Transmission's predecessor, and another entered into an agreement whereby the predecessor was given the right to attach certain of its cable television equipment on poles owned by Electric System. The contract states that

> CATV Company shall pay to Electric System for attachment made to poles owned by it . . . a rental at the rate of $3.00 per pole per year attached by CATV Company. The total amount of such rental shall be payable annually in advance with the first such payment to be made on the first day such television system is initially placed in service. Thereafter, rental shall be payable in advance on the anniversary of such first day in an amount equal to the number of poles attached to by CATV Company on such day times $3.00.

> The annual rental and/or expense deposit payable by CATV Company under this agreement may be adjusted at any time after five (5) years from the date of this agreement upon the written request of any party hereto. In case of adjustment any new rental or expense deposit agreed upon shall continue in effect for five (5) years

thereafter, at which time such rental and/or expense deposit shall again be subject to review and readjustment upon the written request of any party thereto.

The document further provides that the

agreement shall become effective upon September 1, 1967 and if not terminated in accordance with the provisions of Section 15 shall continue in effect for a term of not less than twenty (20) years. Any party may terminate the agreement at the end of said twenty (20) year period, or at any time thereafter, by giving to the other parties at least twelve (12) months' prior written notice.

The termination provision referred to above recites:

If CATV Company shall fail to pay any rental or other charges agreed to be paid under this agreement, or if CATV Company shall fail to comply with any of the other provisions of this agreement, or default in any of its other obligations in this agreement, and shall fail within thirty (30) days after written notice from . . . Electric System to correct such failure, default or noncompliance . . . Electric System may, at [its] option, forthwith terminate this agreement or the permit covering the poles as to which such default or noncompliance shall have occurred. In the event that . . . Electric System terminate[s] this agreement, in whole or in part, CATV Company shall within thirty (30) days thereafter remove all attachments from . . . Electric System's poles involved and in the event that CATV Company does not remove its attachments within said period of thirty (30) days . . . Electric System may do so, the removal costs to be borne, in any event, by CATV Company.

On July 27, 1981, Electric System advised T.V. Transmission that the former wished to review the contract with a view toward, among other things, establishing a new pole attachment rental charge "prior to the anniversary date in September, 1981."

Efforts to reach an agreement to increase the pole attachment rental to $4.80, as Electric System wished, failed. Thereafter, Electric System notified T.V. Transmission that the latter was in default of the contract. T.V. Transmission then instituted this suit.

Electric System assigns five errors: that the trial court's decision (1) is contrary to law as contravening the intention of the parties, (2) exceeds the court's authority by setting a rate for a public utility, (3) compels the honoring of a contract which is ultra vires, (4) compels discrimination among similar classes of ratepayers, and (5) renders the contract unconscionable.

We begin the analysis of the issues raised by Electric System's first assignment of error by recalling that an unambiguous contract is not subject to interpretation or construction and that in such a contract the intention of the parties must be determined from its contents alone. *Moreland v. Transit Auth. of Omaha*, 217 Neb. 775, 352 N.W.2d 556 (1984); *Kansas-Nebraska Nat. Gas Co. v. Swanson Bros.*, 215 Neb. 398, 338 N.W.2d 774 (1983); *Meyers v. Frohm Holdings, Inc.*, 211 Neb. 329, 318 N.W.2d 716 (1982); *Baltes v. Hodges*, 207 Neb. 740, 301 N.W.2d 92 (1981); *Rullman v. LaFrance, Walker, Jackley & Saville*, 206 Neb. 180, 292 N.W.2d 19 (1980).

A literal reading of the contract language establishes that the contractual relationship between Electric System and T.V. Transmission is to exist through at least August 31, 1987, during which time the parties have an opportunity to, by agreement but not unilaterally, increase or decrease the pole attachment rental for a 5-year period at any time from and after September 1, 1972. The parties chose to remain silent on what was to happen if such an adjustment could not be agreed upon. This circumstance, however, does not render the agreement ambiguous.

An ambiguity exists when an application of the rules of construction leaves uncertain which of two or more meanings represents the true intention of the parties. *Meyers v. Frohm Holdings, Inc., supra*. See, also, *Quinn v. Godfather's Investments*, 213 Neb. 665, 330 N.W.2d 921 (1983). Rather than language which permits more than one intention of the parties to be inferred with respect to what is to occur in the absence of a future agreement as to a change in the pole attachment rental, there is no language from which to infer any intent whatsoever. That constitutes a void but not an ambiguity.

Courts are not free to rewrite a contract for the parties or speculate as to terms which the parties have not seen fit to set

out. *Kansas-Nebraska Nat. Gas Co. v. Swanson Bros., supra.*

In *Alward v. United Mineral Products Co.*, 197 Neb. 658, 250 N.W.2d 623 (1977), the plaintiff employee and the defendant company entered into an oral contract whereby the employee was to be paid a base salary plus an incentive bonus of 10 percent of any reduction in plant production costs. This bonus was to be calculated from a formula to be agreed upon later; however, no such agreement was ever reached. In holding for the defendant company in a suit later filed by the employee seeking payment of this bonus, this court stated:

Without such agreement, no formula could ever become effective. An agreement to make a future contract is not binding upon either party unless all terms and conditions are agreed upon and nothing is left to future negotiation. When an agreement stipulates that certain terms shall be settled later by the parties, such terms do not become binding unless and until they are settled by later agreement.

*Id.* at 661, 250 N.W.2d at 625.

A lease in *R.A.S., Inc. v. Crowley*, 217 Neb. 811, 813, 351 N.W.2d 414, 415 (1984), provided:

At the expiration of this Second Supplemental Lease Extension Agreement on May 1, 1983, the second party shall have the privilege of an option for the further extension of this lease for an additional period of 10 years from and after May 1, 1983. Both parties agree that the rental terms and conditions for this lease shall be renegotiated as of May 1, 1983 for the 10 year term beginning on that date. The rental terms and conditions shall be negotiated upon a basis which is satisfactory and acceptable to both parties. Both parties agree to negotiate such terms consistant [sic] with conditions existing on May 1, 1983, to provide rental terms and conditions substantially the same as those now existing, with appropriate adjustments, however, satisfactory to both parties and covering the 10 year term beginning May 1, 1983.

In holding the foregoing provision unenforceable because the lease did not set forth the rent to be paid during the renewal

period and the parties were unable to reach an agreement thereon, the court noted:

> The law does not compel a duty to perform that which one has not contractually agreed to do, either expressly or impliedly. As no binding contract existed, nor is one alleged to be implied in law, we conclude the trial court was correct in declaring the option provision unenforceable.

*Id.* at 815, 351 N.W.2d at 416.

It is clear, then, that the modification provision before us constitutes nothing more than an agreement to agree in the future. In the absence of such a future agreement, the provision is of no effect and is therefore unenforceable.

The parties do not appear to argue otherwise, but do disagree sharply as to the result of this unenforceability. Electric System argues that the inclusion of the adjustment clause indicates that neither party intended to be bound to a 20-year $3 rental, and, therefore, the contract should terminate. T.V. Transmission, on the other hand, argues that the remainder of the contract remains valid and the unenforceable clause is to be severed.

Keeping in mind that the whole contract must be considered when seeking its meaning, *Bass v. Dalton*, 213 Neb. 360, 329 N.W.2d 115 (1983), and *Dockendorf v. Orner*, 206 Neb. 456, 293 N.W.2d 395 (1980), the trial court was correct in determining that, absent an agreed-upon modification by the parties, the contract was to continue for at least 20 years at the $3 rental specified upon execution. Any other interpretation would completely ignore the clause providing for a minimum 20-year duration, as well as the default provision which specifically enumerates when the contract can be terminated before the expiration of that period. Moreover, this reading does nothing to vitiate the clause were the parties to have reached an agreement to change the rental charge.

The parties are bound by the terms of their contract even though their actual intent may have been different than that expressed in the document. *Bass v. Dalton, supra.* Consequently, the first assignment of error is without merit.

In its second assignment of error Electric System argues that the trial court exceeded its authority and invaded the legislative

domain when it set the "rate" Electric System could charge T.V. Transmission. This argument fails for the very basic reason that the trial court did no such thing. Instead of setting anything, the court enforced the contract executed by the parties. It is that contract, not the court, which set the pole attachment rental, whether it be a "rate" or something else. That being so, the second assignment of error fails without any need to study the role of the judiciary in the utility ratesetting process.

Electric System next argues that the reading given the contract by the trial court renders it ultra vires due to the fact that the applicable statutes and municipal code reserve to the Lincoln City Council the authority to set all "rates." It urges that since, absent an agreement between the parties, the contract pole attachment rental cannot be changed until the expiration of the minimum 20-year contractual period, the council's authority to set rates has been usurped by the contract.

For support in making those contentions, Electric System cites *Seidel v. City of Seward*, 178 Neb. 345, 347, 133 N.W.2d 390, 392 (1965), which states that "[a] city has no power to enter into contracts which curtail or prohibit its exercise of legislative or administrative authority." A more recent statement of the rule is found in *Gallagher v. City of Omaha*, 189 Neb. 598, 605, 204 N.W.2d 157, 161 (1973): "A city, in the absence of legislative authorization, has no power to enter into contracts which curtail or prohibit its exercise of legislative or administrative authority." However, the facts to which those rules were applied in the foregoing two cases are not in any sense similar to the facts of the case before us. *Seidel* refused to enforce an oral agreement of a single city councilman to locate a disputed boundary other than at its true location. While no city action was involved in *Seidel*, no claim is made in the present case that proper procedures were not followed in negotiating and executing the contract. *Gallagher* held that the statutes relied upon by the city and university did not authorize the university to acquire exclusive use during specified periods of a portion of one of the city's parks. There is no claim in this case that Electric System has no power to allow the use of its poles for a fee. A municipal corporation's contract is ultra vires when the corporation has no power to make the contract under any

circumstances or for any purpose. *Warren v. County of Stanton*, 145 Neb. 220, 15 N.W.2d 757 (1944).

Electric System's argument is really not that it had no power to enter into the contract but that 20 years is too long to have to live with the same terms. In effect, Electric System's argument is that in retrospect it finds it made a bad bargain. As we have seen from the analysis prompted by Electric System's first assignment of error, such a circumstance in and of itself provides no basis for rewriting the agreement.

There may be a point at which a contract for an unreasonably long duration may go beyond the objects for which a municipal corporation was created and therefore be ultra vires, see, 10 E. McQuillin, The Law of Municipal Corporations § 29.10 (3d ed. 1981), and 63 C.J.S. *Municipal Corporations* § 979 b. (1950), but there is no evidence in this case that a minimum period of 20 years is an unreasonably long duration for the particular contract involved.

We must bear in mind that what is involved in this case is the exercise by Electric System of a proprietary, as distinguished from a governmental, function. See *State, ex rel. Consumers Public Power District, v. Boettcher*, 138 Neb. 22, 291 N.W. 709 (1940), which holds that a city's purchase of an electric system is a nongovernmental business enterprise. In contracts relating to its proprietary interests, a municipal corporation is bound by the same rules as are private corporations. See, *State, ex rel. Consumers Public Power District, v. Boettcher, supra*; *Omaha Water Co. v. City of Omaha*, 147 F. 1 (8th Cir. 1906), *appeal dismissed* 207 U.S. 584, 28 S. Ct. 262, 52 L. Ed. 351 (1907).

Electric System's third assignment of error therefore also fails.

In its fourth assignment of error Electric System argues that since it charges the cable television company in Waverly an attachment rental of $4.80 per pole per year, enforcement of the subject contract at $3 per pole forces Electric System to discriminate against similar classes of ratepayers, in violation of the law.

Electric System apparently relies upon Neb. Rev. Stat. § 70-655 (Reissue 1981) and Lincoln Mun. Code § 2.55.070 (1984) for its ratesetting authority.

Section 70-655 states:

> The board of directors of any district organized under or subject to Chapter 70, article 6, shall have the power and be required to fix, establish, and collect adequate rates, tolls, rents; and other charges, for electrical energy, water service, water storage, and for any and all other commodities, services, or facilities sold, furnished, or supplied by the district, which rates, tolls, rents, and charges shall be fair, reasonable, nondiscriminatory, and so adjusted as in a fair and equitable manner to confer upon and distribute among the users and consumers of commodities and services furnished or sold by the district the benefits of a successful and profitable operation and conduct of the business of the district.

Section 2.55.070 provides:

> The board shall:
>
> . . . .
>
> (b) Purchase and contract for all materials, parts, services, supplies, and equipment required by Lincoln electric system; . . .
>
> . . . .
>
> (d) Do all other acts necessary to carry out the provisions of this ordinance save and except: (1) The matter of establishing rates which authority shall be vested solely in the Lincoln city council . . . .

To begin with, it is not clear, and we need not and therefore do not decide, whether § 70-655 covers the situation presented here or whether it covers only charges made by Electric System to its electric energy consumers. See, *McGinley v. Wheat Belt P.P. Dist.*, 214 Neb. 178, 332 N.W.2d 915 (1983); *Kansas-Nebraska Nat. Gas Co., Inc. v. City of Sidney*, 186 Neb. 168, 181 N.W.2d 682 (1970); *Rutherford v. City of Omaha*, 183 Neb. 398, 160 N.W.2d 223 (1968).

Regardless of whether the requirement of nondiscriminatory charges is pertinent in this case, the fourth assignment of error must nonetheless fail. The plaintiff in *Bleick v. City of Papillion*, 219 Neb. 574, 365 N.W.2d 405 (1985), lived outside the city limits of Papillion but within the boundaries of a sanitary and improvement district. The district entered into a

contract with the city for water and sewer services which permitted the city to charge fees up to twice those charged to city residents for like services. In upholding the contract this court reasoned that as the furnishing of permitted services to persons outside the city limits is contractual and not a duty imposed by statute, "public utilities generally may discriminate, in respect to rates, between consumers within and those outside the municipalities primarily served." *Id.* at 577, 365 N.W.2d at 407.

Electric System, created by the Lincoln Municipal Code, may therefore treat Waverly residents differently than Lincoln residents.

Finally, Electric System argues that the trial court's reading of the contract renders it unconscionable. No such issue was presented to the trial court by Electric System in either its answer, counterclaim, or motion for new trial. It is raised for the first time in Electric System's brief in this court. In a like circumstance, *Guaranteed Foods v. Rison*, 207 Neb. 400, 299 N.W.2d 507 (1980), refused to consider the argument that a contract was unconscionable, citing the well-established rule that defenses not raised or litigated in the trial court cannot be raised for the first time on appeal.

Moreover, there is nothing in the record before us which brings into question the unconscionability of the contract at issue. In discussing the matter of the alleged unconscionability of a contract in the context of Neb. U.C.C. § 2-302 (Reissue 1980), this court, in *Melcher v. Boesch Motor Co.*, 188 Neb. 522, 526, 198 N.W.2d 57, 61 (1972), quoted with approval from the comments to that section as follows:

> "The basic test is whether in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable *under the circumstances existing at the time of the making of the contract.* . . . The principle is one of the prevention of oppression and unfair surprise . . . and not of disturbance of allocation of risks because of superior bargaining power."

(Emphasis supplied.)

Admittedly, this is not a Uniform Commercial Code case; consequently, *Melcher* has no direct application. However, in view of the fact that the issue is not properly before us, we need not and do not decide whether a defense based upon the unconscionability of a contract extends to transactions other than for the sale of goods, 14 S. Williston, A Treatise on the Law of Contracts § 1632B (3d ed. 1972), nor do we need concern ourselves with what the precise elements of such a defense might be.

There being no merit to any of Electric System's assignments of error, the judgment of the trial court is affirmed.

AFFIRMED.

KRIVOSHA, C.J., not participating.