**SIOUX CITY FOUNDRY COMPANY,**
an Iowa Corporation, Plaintiff–
Appellant,

v.

**CITY OF SOUTH SIOUX CITY, NE-
BRASKA, a Municipal Corpora-
tion, Defendant–Appellee,**

Ernest Albertsen, Keith Ferris, Wayne Boyd, Don McKinney, Richard Petersen, Jack Bobier, Merrill Downhour, Wayne Shanks, Harold Pilgrim, Jerry Curry, Frank Boeshart, Vern Larson, Don Lahann, Dennis Nelson, Third–Party Defendants.

No. 91–2268.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 12, 1991.

Decided July 10, 1992.

Rehearing and Rehearing En Banc
Denied Sept. 3, 1992.

Douglas L. Curry, Lincoln, Neb., argued (Linda W. Rohman, on the brief), for appellant.

David M. Geier, Lincoln, Neb., argued (Richard M. Duxbury, on the brief), for appellee.

Before MAGILL, Circuit Judge, FRIEDMAN,* Senior Circuit Judge, and LOKEN, Circuit Judge.

LOKEN, Circuit Judge.

In 1968, Sioux City Foundry Company ("SCF") contracted with South Sioux City, Nebraska, to purchase electricity from the City-owned utility at a special rate. In April 1989, after determining that the special rate was failing to cover its wholesale power costs, the City declared the contract null and void and began billing SCF at a significantly higher rate. SCF, a citizen of Iowa, brought this diversity suit to enforce the contract and appeals the district court's determination that the contract is *ultra vires* and unenforceable. Concluding that the contract was within the City's delegated powers, we reverse.

## I.

In 1968, SCF wanted to build a new plant for its casting division, and South Sioux City was anxious to attract new industry. The City urged SCF to build the plant in South Sioux City and offered to provide electricity from its municipally owned distribution system at a favorable rate. Because it had no other power customer of comparable size, the City devised an appropriate large-user rate with the help of its wholesale supplier, Consumers Public Power District (CPPD).

At a meeting on Christmas Eve 1968, the City Council approved by resolution a contract under which the City would provide electricity to SCF's new plant at a Special Foundry Power Rate (the Foundry Rate). The contract term was twenty-three years, the length of CPPD's franchise to supply power to the City. The contract included rate-escalation provisions permitting the City to pass on increases in its wholesale electricity costs. Following City Council approval, SCF announced that it would build the million-dollar plant in South Sioux City. The parties signed a written contract and SCF completed the plant in 1969.

The contract was substantially modified in 1977, reflecting the City's determination that the rate-adjustment provisions were inadequate. SCF agreed to increase the base rate and to amend the rate-escalation provisions, and the City agreed to extend the term of the contract until September 16, 2002. The Foundry Rate was adjusted annually in accordance with this 1977 addendum until 1989.

By the late 1980s, the Foundry Rate had become less favorable to the City because the demand charges it was paying to its supplier, now the Nebraska Public Power District, had escalated dramatically, while the City's demand charges to SCF were fixed for the length of the contract in the 1977 addendum.[1] . Moreover, when more sophisticated meters were installed, the City determined that SCF's peak demand periods largely coincided with the City's, which increased the City's cost of power.[2]

In March 1989, City Attorney Wayne Boyd opined that the contract would be invalid if the City's consultant concluded that the Foundry Rate was "not fair, reasonable and adequate to return the cost of service to the City, with a reasonable return for capital, construction and payment of indebtedness." That same month, the City's consultant reported that, "For fiscal year 1988, the cost of service [under the contract] was $537,004 compared to revenues received of $337,301." At a meeting on April 4, 1989, the City Council passed a motion declaring the SCF contract "null

---

* The HONORABLE DANIEL M. FRIEDMAN, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

1. The City's wholesale rate, like the Foundry Rate, consisted of "demand" and "energy" components. However, the demand component was a much larger proportion of the City's wholesale rate, which exacerbated the impact of the City incurring increasing wholesale demand charges after it agreed to a fixed demand charge in the Foundry Rate. Under the 1977 addendum, the rate escalation provisions apply only to the energy component of the Foundry Rate.

2. In the last paragraph of the contract, SCF agreed "to cooperate with the city, whenever possible to prevent their demand peak from reaching its highest point at the same time as the city demand peak." The record does not reflect any effort by the City to enforce this clause.

and void." The City then began billing SCF at the "Large Light and Power" rate contained in the City's 1982 general rate ordinance. SCF's electricity charges have been, on average, about $20,000 per month higher under this rate than under the Foundry Rate.

In response, SCF protested and commenced this action. SCF's amended complaint seeks declaratory and injunctive relief and damages, alleging that the contract is valid, that the City breached the contract by declaring it null and void and by unilaterally implementing the Large Light and Power rate, and that the City is estopped to deny the contract's validity. Following an evidentiary hearing, the district court preliminarily enjoined the City from attempting to collect the higher rates. Applying the preliminary injunction factors from *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109 (8th Cir.1981), the court tentatively concluded, among other things, that SCF would probably prevail on the merits because the contract was a valid exercise of the City's proprietary powers.

SCF then moved for summary judgment. Reversing its previous position, the district court denied this motion and dissolved the preliminary injunction, concluding that there was no specific statutory authority for the contract, that a municipality may not contract away its legislative rate-setting power absent clear statutory authority, and therefore that the contract was *ultra vires* and void. SCF appeals the district court's dissolution of the preliminary injunction, an appealable order under 28 U.S.C. § 1292(a)(1).

Although the decision to grant or deny a preliminary injunction is generally subject to appellate review only for abuse of discretion, the parties argue legal rather than discretionary equitable issues on this appeal.[3] Both parties ask us to take up the district court's ruling that the 1968 contract is invalid, a question of law that we review de novo. *See Bell v. Sellevold*, 713 F.2d 1396, 1399 (8th Cir.1983), *cert. denied*, 464 U.S. 1070, 104 S.Ct. 978, 79 L.Ed.2d 215 (1984).

## II.

The parties present us with a narrow issue, whether the City in 1968 had the power to enter into a binding long-term contract specifying the rates SCF would pay for electricity purchased from the municipal distribution system. The parties agree that Nebraska law governs. South Sioux City, as a municipal corporation, has only those powers delegated to it by the State; these include powers "granted in express words; ... those necessarily or fairly implied in or incident to the powers expressly granted; [and] those essential to the declared objects and purposes of the corporation." *Jacobs v. City of Omaha*, 181 Neb. 101, 147 N.W.2d 160, 163 (1966).

In general, municipal powers are either legislative or proprietary. *See* 2 Charles Keating and Stephen Flanagan, McQuillin's Law of Municipal Corporations § 10.05 (3d ed. 1988). The distinction is important for two reasons. First, the grant of proprietary powers to act in the city's corporate capacity for the benefit of its residents "necessarily implies all the incidental powers to do anything that any business man or corporation ought to do in operating a successful business enterprise." *Nelson–Johnston & Doudna v. Metropolitan Util. Dist.*, 137 Neb. 871, 291 N.W. 558, 560–61 (1940) (power to operate municipal electric utility includes power to sell appliances at retail). On the other hand, legislative powers are the acts of the sovereign and may only be exercised when expressly delegated by the state legislature. *See Wabaska Elec. Co. v. City of Wymore*, 60 Neb. 199, 82 N.W. 626, 627 (1900) (municipality has no power to regulate private utility's rates absent statutory authority).

---

3. During the pendency of this action, SCF has continued to pay at the Foundry Rate, but has escrowed the difference between that amount and the amount billed by the City. At one point, the City threatened to shut off SCF's power for nonpayment, but agreed in August 1990 to await a final decision on the merits, prompting the district court to deny an injunction pending appeal as unnecessary. Thus, the status quo is being effectively preserved.

Second, and more germane to this case, while long-term contracts are a readily accepted method of exercising a municipality's proprietary powers, they are highly suspect in the legislative arena. *See generally* 56 Am.Jur.2d, Municipal Corporations § 154 (2d ed. 1971). In Nebraska law, this is reflected in the axiom that, "A city has no power to enter into contracts which curtail or prohibit its exercise of legislative or administrative authority." *Seidel v. City of Seward,* 178 Neb. 345, 133 N.W.2d 390, 392 (1965). That axiom is the core of the City's contention that its 1968 contract with SCF was *ultra vires.*

Nebraska cases have long recognized that, when a municipality enters into a long-term contract that fixes the rates at which electricity, gas, or water will be sold to its citizens, the municipality is exercising a power that may be proprietary, legislative, or both. *Wabaska Elec. Co., supra,* reflected the near-universal view that rate-making is a legislative function that must be expressly delegated by the State. *City of University Place v. Lincoln Gas & Electric L. Co.,* 109 Neb. 370, 191 N.W. 432 (1922), held that rate-making may be a proprietary function as well. There, the city entered into a long-term contract under which a private company constructed a gas works and sold gas in the city at prescribed rates. During the contract term, the company challenged the now-inadequate rates on the ground that the city had not been granted the power to regulate public utility rates at the time it entered into the contract. The court nevertheless upheld the contract, concluding that the power to prescribe rates was implicit in the city's proprietary power to contract for the construction of the gas works. The court distinguished *Wabaska* as

authority only upon the general proposition that a municipal corporation has no authority to exercise the governmental function of regulating rates to be charged by a public utility corporation unless expressly authorized by the Legislature, and the question there decided differs essentially from the one under discussion, which ... involves the question of the power of the city to *agree* *upon* the charge to be made for the service for a reasonable period as a consideration for the granting of the franchise.

191 N.W. at 436 (emphasis in original).

More difficult issues of statutory construction arise when the legislature has delegated both the legislative power to fix rates, and the overlapping proprietary power to contract to buy or sell electricity. Most courts have held that these distinct governmental powers are not mutually exclusive and therefore the contracting power to bargain on behalf of the city as buyer or seller is not extinguished or curtailed by the legislative power to regulate rates. As the Supreme Court said in *St. Cloud Pub. Serv. Co. v. City of St. Cloud,* 265 U.S. 352, 359–60, 44 S.Ct. 492, 494–95, 68 L.Ed. 1050 (1924):

[I]n the present case ... we think that the City might either contract as to the rates, as an incident to its power of granting the right to construct and operate the public utility, or, if it did not exercise this power to contract, might thereafter "regulate and prescribe" the rates in the exercise of [its legislative] authority.... *One power, however, is not destructive of the other. And where a municipality has both the power to contract as to rates and also the power to prescribe rates from time to time, if it exercises the power to contract, its power to regulate the rates during the period of the contract is thereby suspended, and the contract is binding.*

(Emphasis added.) *See also Vicksburg v. Vicksburg Waterworks Co.,* 206 U.S. 496, 515–16, 27 S.Ct. 762, 769, 51 L.Ed. 1155 (1907); *Trans World Airlines, Inc. v. City of San Francisco,* 228 F.2d 473, 477 (9th Cir.1955), *cert. denied,* 351 U.S. 919, 76 S.Ct. 711, 100 L.Ed. 1451 (1956) ("the courts have recognized that the specific authority to contract, insofar as this authority conflicts with the general power conferred on the municipality to regulate public utility rates, should prevail"); *Scott Paper Co. v. City of Anacortes,* 90 Wash.2d 19, 578 P.2d 1292, 1297–98 (1978).

The Supreme Court of Nebraska explicitly adopted this principle in *City of University Place*, 191 N.W. at 434 (if "the [rate] contract has the effect to suspend for a time the governmental power to regulate rates ... this does not affect [the contract's] validity, if the time limit be reasonable, and the power to enter into the contract is found"). It was also implicitly recognized in *Cornhusker Elec. Co. v. City of Fairbury*, 134 Neb. 248, 278 N.W. 379 (1938).

We now turn to the specific Nebraska statutes that govern whether the City had the power to commit to the long-term Foundry Rate in the 1968 contract.

Nebraska is a public power State, so it is not surprising that its statutes grant cities of the first class [4] such as South Sioux City broad power "to purchase or provide for, establish, construct, extend, enlarge, maintain, operate, and regulate for the city ... an electrical distribution facility," Neb.Rev. Stat. § 16–674, and to "do all acts necessary for the construction, completion, and management and control of same not inconsistent with law," § 16–684.[5] The City also has the general proprietary power "to make all contracts and do all other acts in relation to the property and concerns of the city necessary to the exercise of its corporate powers." § 16–201(4). In the absence of conflicting legislation, it is clear under Nebraska law that these statutes delegate the implied power to enter into long-term contracts with the City's electricity customers that include rate terms. *City of University Place*, 191 N.W. at 434–35; *Carr v. Fenstermacher*, 119 Neb. 172, 228 N.W. 114 (1929); *Omaha Water Co. v. City of Omaha*, 147 Fed. 1, 12–13 (8th Cir.1906), *appeal dism'd*, 207 U.S. 584, 28 S.Ct. 262, 52 L.Ed. 351 (1907).

Since 1901 Nebraska cities of the first class have also been delegated the legislative authority to regulate the rates charged by both private and municipally owned electric utilities. *See* Neb.Rev.Stat. §§ 16–679, 16–681. The City argues that its legislative power to "regulate and fix" municipal electricity rates, § 16–681, when "the council shall by ordinance deem just or expedient," § 16–682,[6] deprived it of any power to make a long-term rate contract with SCF. We disagree.

■ The City's rate regulation power is conferred in two separate statutes. Section 16–679, which authorizes the regulation of rates charged by *private* utilities, provides in relevant part:

The mayor and council shall have power to ... fix the rents or rates of ... electric light or heat.... *These powers shall not be abridged by ordinance, resolution or contract.*

(Emphasis added.) Section 16–681, which applies to municipal utilities, provides that a city "owning, operating or maintaining its own ... light or heat system.... shall regulate and fix the rental or rate for ... light or heat." However, § 16–681 does not contain the "shall not be abridged" sentence of § 16–679. Both sections were enacted in 1901 in a comprehensive statute that included the grant of broad powers to own and operate municipal utilities, now § 16–684. *See* 1901 Neb.Laws, ch. 18, §§ 55, 57, 59. Read *in pari materia*,[7] this difference between § 16–679 and § 16–681 plainly reflects the Legislature's intent to authorize a city to suspend ("abridge") its legislative rate-making power by contract when the contract is on behalf of a munici-

---

**4.** "First class" cities in Nebraska are those having between 5,000 and 100,000 inhabitants. Neb.Rev.Stat. § 16–101.

**5.** *See also* § 18–412 (power to sell revenue bonds for this purpose); § 19–1401 ("power to purchase, construct, maintain and improve heating and lighting systems").

**6.** The City conceded at oral argument that, if the 1968 contract was within the City's powers, it is irrelevant that the council approved it by resolution rather than by ordinance. This concession

reflects the principle that estoppel cannot prevent the invalidation of an *ultra vires* contract, but may apply to a defect that is a mere formality. *Warren v. Stanton County*, 145 Neb. 220, 15 N.W.2d 757, 761–62 (1944).

**7.** "It is a general rule that statutes pertaining to the same subject-matter should be construed together, and this is particularly so if the statutes were passed at the same session of the Legislature." *Nebraska Dist. of Evangelical Lutheran Synod v. McKelvie*, 104 Neb. 93, 175 N.W. 531, 533 (1919).

pal utility, but not when the contract is between the city and a private utility.

This construction is consistent with the general principles articulated in older cases such as *St. Cloud Pub. Serv. Co.*, 265 U.S. at 360, 44 S.Ct. at 495. It is also consistent with the Nebraska Supreme Court's most recent decision on this subject, *T.V. Transmission, Inc. v. City of Lincoln*, 220 Neb. 887, 374 N.W.2d 49 (1985). Lincoln's municipal utility sought to renege on its twenty-year contract with a cable television firm permitting the firm to string wires on the city's utility poles for an annual rental of $3 per pole. Like South Sioux City, Lincoln argued that the contract was *ultra vires* because it "usurped" the statutory rate-setting authority of city officials. The Supreme Court disagreed:

> There is no claim in this case that [Lincoln] has no power to allow the use of its poles for a fee. A municipal corporation's contract is ultra vires when the corporation has no power to make the contract under any circumstances or for any purpose.
>
> [Lincoln's] argument is really not that it had no power to enter into the contract but that 20 years is too long to have to live with the same terms. In effect, [Lincoln's] argument is that in retrospect it finds it made a bad bargain.

374 N.W.2d at 54–55 (citation omitted).

South Sioux City attempts to distinguish *T.V. Transmission* on the ground that Lincoln was setting rates for an "incidental fee," not the delivery of electric service. However, the court in *T.V. Transmission* made no such distinction. Instead, it narrowly construed the axiom upon which the City relies, that "a city has no power to enter into contracts which curtail or prohibit its exercise of legislative or administrative authority," *Id.*, 374 N.W.2d at 54. Our reading of *T.V. Transmission* is consistent with older Nebraska cases such as *City of University Place*. Together, these cases conclusively support our view that the difference between § 16–679 and § 16–681 reflects a legislative intent to grant the City power to enter into a long-term rate contract on behalf of its municipal utility.

Finally, this construction of the statutes reflects the substantive difference between rate regulation of private and municipal utilities. When a municipality fixes rates for its own system, it sits on both sides of the rate-making table. Its decisions are subject to public interest considerations that could reasonably persuade the Legislature to grant the power to enter into long-term rate contracts. For example, in 1968 the City wanted SCF to locate its new plant in South Sioux City. As one Council member commented at the Christmas Eve 1968 meeting, "I feel if we don't make a penny even to have the industry, we're making money." SCF needed a long-term commitment of electric power at reasonable rates. The City took sophisticated steps to protect itself by enlisting help from its supplier in devising the initial rate formula, and by rewriting the complex rate-escalation clauses in the 1977 addendum. Like Lincoln in *T.V. Transmission*, the City's real argument here "is that in retrospect it finds it made a bad bargain." That does not make the 1968 contract *ultra vires*.

█  Accordingly, we conclude that the City's 1968 contract with SCF was not *ultra vires* and therefore the district court erred in dissolving the preliminary injunction on this ground. We reverse and remand the case for further proceedings consistent with this opinion.